[Civ. No. 20396.   Second Dist., Div. One.   Dec. 29, 1954.]

ROBERT CHASE, Plaintiff and Appellant, v. NATIONAL INDEMNITY COMPANY (a Corporation) et al., Defendants and Appellants; BANK OF AMERICA, Cross-Complainant and Appellant; KURT HITKE AND COMPANY, INC. (a Corporation) et al., Defendants and Respondents; L. G. MAULHARDT EQUIPMENT COMPANY et al., Cross-Defendants and Respondents.

Churchill & Teague and E. Perry Churchill for Plaintiff and Appellant.

John S. Bolton and F. V. Lopardo for Defendant and Appellant National Indemnity Company.

Hindman & Davis and E. Eugene Davis for Defendant and Appellant Rainier National Insurance Company.

Samuel B. Stewart, Hugo A. Steinmeyer and Winfield Jones for Cross-Complainant and Appellant.

Edward C. Maxwell and Robert B. Maxwell for Defendants and Respondents.

William A. Reppy for Cross-Defendants and Respondents.

MOSK, J. pro tem.*—Four separate appeals have been filed in this proceeding involving a complaint and three cross-complaints, all arising from questions revolving about insurance coverage of a truck and van involved in a collision near Phoenix, Arizona, on July 13, 1950.

---

*Assigned by Chairman of Judicial Council.

Plaintiff Robert Chase purchased under a conditional sales contract from L. G. Maulhardt Equipment Company (hereinafter called Maulhardt) an International tractor and a closed van standard utility trailer on or about March 10, 1950. The total purchase price was $28,638.11, of which $3,777.42 was paid in cash at the time of the sale and the balance of $24,860.69, was payable·in monthly installments of $690.74. The interest of Maulhardt in the contract and equipment was sold immediately and assigned to the Bank of America National Trust and Savings Association (hereinafter called Bank).

On or about May 10, 1950, Rainier National Insurance Company, a Washington corporation (hereinafter called Rainier) issued through its agent at Oxnard, Walter H. Yung, a policy insuring the equipment for actual cash value, less $250 deductible, against loss or damage arising from collision or upset, and for actual cash value against loss arising from fire, transportation or theft for the period from May 18, 1950, to May 18, 1951. This policy was issued to Chase as insured and it bore a loss payable endorsement in favor of the Bank and was delivered to the Bank to be held in connection with the conditional sales contract.

This policy also contained, among other provisions, a special warranty whereby Chase agreed that ''the regular or frequent use of the commercial type vehicle(s) described in such policy is and will be confined to the territory within fifty miles of Oxnard, California.'' Being desirous of handling long haul freighting beyond the 50-mile limit, Chase discussed with Yung the necessity for less limited insurance coverage. Yung in turn consulted Rainier's managing general agent at Los Angeles and was advised that Rainier did not desire to write long haul insurance.

Thereafter Yung contacted Kurt Hitke and Company, Inc., (hereinafter called Hitke) and with that agency obtained coverage through the National Indemnity Company (hereinafter called National). There is a serious and irreconcilable conflict in the evidence as to whether Yung assured Chase that he had obtained full coverage through Hitke and National on an actual cash value basis, or whether Yung was told that National would insure only on a stated amount value basis. In any event on or about July 6, 1950, Yung forwarded a completed insurance application to Hitke requesting insurance coverage of the tractor for fire, theft and collision, less $500 deductible for the sum of $10,000, and the utility trailer for fire, theft and collision, less $500 deductible for the sum of

$4,000, or a total of $14,000 on both pieces of equipment. The application purportedly bore the signature of Chase but in fact Yung signed Chase's name to the application. The application stated that this equipment had not been previously insured, although it had been theretofore and was then actually insured by Rainier. The application stated that the proposed insured, Chase, had an estimated net worth of $100,000, whereas his net worth was little more than the equity in the equipment. The application further stated that Chase maintained his own repair shop, which was false.

Hitke, as general agent of National, issued a policy effective at 2 p. m. July 12, 1950, for fire, theft and collision in the total sum of $14,000, less the $500 deductible as to each piece of equipment. The policy was not physically delivered by Hitke to Yung until July 25, 1950.

On the 12th, Yung advised Chase that the new insurance was effective and Chase thereupon notified his drivers in order to expedite their crossing of state lines. Chase had agreed with Yung that as soon as their binder in the other company became effective, coverage for the tractor and van would be eliminated from the Rainier policy and Chase would be given credit for the return premium on these items in the Rainier policy. In the early morning of July 13, 1950, some distance east of Phoenix, Arizona, the tractor and van were involved in an accident which the court found to be a collision and, as determined by the court, both pieces of equipment were totally destroyed. Testimony indicated that the fair market value of the equipment as of the date of loss was $21,000.

After the accident National took charge of the salvage and offered to pay the loss of $14,000, but denied any liability over that sum. It has to date paid no sum whatever. The subsequent controversy gave rise to this complicated lawsuit. Chase initiated the action naming as defendants National, Rainier and the Bank of America. All three defendants filed answers and cross-complaints naming all of the others as cross-defendants, and in addition thereto Yung, Hitke and Maulhardt.

The trial court found the facts and issues in favor of Chase on his complaint and the Bank on its cross-complaint, rendered judgment in favor of Yung, Hitke and Maulhardt and in favor of all of the cross-defendants on the cross-complaints of National and Rainier. Separate appeals have been filed by Rainier, National, Chase and the Bank.

### The Rainier Appeal

In its second, separate defense to the amended complaint, Rainier contended Chase breached the 50-mile radius warranty. The court should have so found, it maintains on this appeal.

A statement in an insurance policy importing an intention to do or not to do a thing which materially affects the risk is a warranty that such act or omission will take place. (Ins. Code, § 445.) A warranty may relate to the past, the present, the future or to any or all of these. (Ins. Code, § 444.) ■ Generally speaking, compliance with the terms of a warranty is a condition precedent to a right of recovery. (*De Campos* v. *State Comp. Ins. Fund*, 122 Cal.App.2d 519, 530 [265 P.2d 617].) For a discussion of warranties in insurance contracts see *McKenzie* v. *Scottish Union & Nat. Ins. Co.*, 112 Cal. 548, 554-555 [44 P. 922].

■ A contract of insurance must be governed and interpreted by the same rules which ordinarily apply to other contracts, and it will be enforced only according to the manifest intention of the parties. (*Stevenson* v. *Sun Ins. Office*, 17 Cal.App. 280, 288 [119 P. 529].) ■ Thus requirements contained in a policy of insurance may be waived by the parties. ■ To constitute a waiver there must be an existing right, a knowledge of its existence, and an actual intention to relinquish it, or such conduct as warrants an inference of the relinquishment. ■ It is a voluntary act and implies an abandonment of a right or privilege—an election to dispense with something of value or to forego some advantage which one might, at his option, have demanded. ■ In no case will a waiver be presumed or implied contrary to the intention of the party whose rights would be injuriously affected thereby, unless by his conduct the opposite party has been misled, to his prejudice, into the honest belief that such waiver was intended or consented to. (*McDanels* v. *General Ins. Co.*, 1 Cal.App.2d 454, 460 [35 P.2d 394, 36 P.2d 829].)

On cross-examination Chase produced records of his hauls with equipment involved herein and they indicated numerous trips taken beyond the prohibited distance. On the other hand the evidence established beyond question that Yung was a general agent for Rainier and as such he signed and issued the policy to Chase. In that capacity he had been told that most of Chase's hauls were from Oxnard to Los Angeles points and occasionally to the San Francisco area, both being more than 50 miles distant. ■ It has long been established

in this state that a general agent has the authority to waive conditions in an insurance policy by mere parol, even though the policy itself requires waivers to be in writing. As stated in *Mackintosh* v. *Agricultural Fire Ins. Co.*, 150 Cal. 440, at 449 [89 P. 102, 119 Am.St.Rep. 234] : "Waivers such as that here made, constituting, as they do, a new contract upon a sufficient consideration, need not be evidenced by a writing, and need not be indorsed on the policy, no matter what limitations or conditions are expressed in the policy, provided always they are made by an agent who would otherwise have authority to make the contract." To the same effect are *Golden Gate Motor Transport Co.* v. *Great American Indem. Co.*, 6 Cal.2d 439 [58 P.2d 374] ; *Bank of Anderson* v. *Home Ins. Co.*, 14 Cal.App. 208 [111 P. 507] ; 29 Am.Jur. 625.

It seems that Rainier, acting through its general agent, placed its own construction on the territorial limitation provisions and did not consider the trips taken by Chase to be violative thereof. It is true that upon inquiry the company indicated it would not write long haul insurance for Chase. But the evidence discloses Rainier clearly waived its prohibition as to the previous trips and to the particular trip involved herein, the unreached destination being Omaha. The trial court so held, and the evidence, though conflicting, supports that finding.

Rainier contends that by mutual agreement prior to the loss its coverage was eliminated and canceled by virtue of the substitution of the National policy. However, the provisions of the Rainier policy made it impossible for it to be canceled or modified without 10 days' notice to the Bank. Paragraph 4 of the loss payable indorsement provided that if the company elected to cancel the policy for any reason it "will forward a copy of the cancellation notice to the Lien-Holder at its office" and that "In no event, as to the interest only of the Lien-Holder, shall cancellation of any insurance under this policy covering the property described in the policy be effected at the request of the insured before ten (10) days after written notice of request for cancellation shall have been given to the Lien-Holder by the Company." This could not be accomplished in this instance since the loss occurred one day after the purported substitution.

The law is clear that provisions of a loss payable indorsement attached to a policy of insurance control over any contrary provisions in the body of the policy. (*Fageol T. & C. Co.* v. *Pacific Indem. Co.*, 18 Cal.2d 731 [117 P.2d

661].) ██ Any cancellation of the insurance by the insurer or insured must be strictly in accordance with the provisions of the indorsement to be effective as to the loss payee. (*Tarleton* v. *De Veuve*, 113 F.2d 290 [132 A.L.R. 343].) For a discussion of the inability to cancel a policy unless there has been strict compliance with all of its provisions, see *Frieze* v. *West American Ins. Co.*, 188 F.2d 331.

Therefore it seems clear that the Rainier policy was not canceled at the time of the loss, since no attempt was made to terminate the policy in accordance with requirements of the loss payable indorsement. As stated in *Tarleton* v. *De Veuve*, *supra*, at page 298, "Thus no cancellation attempted by the mortgagor or insurer, of which the mortgagee was ignorant and to which she had not consented, could suffice to relieve the mortgagee of any rights arising under the mortgage clause. . . . In view of the authorities we are constrained to hold that, in the absence of knowledge on the part of the mortgagee which would constitute a waiver, ten days' notice before cancellation was essential to extinguish the mortgagee's interest in the policy."

It is no answer to the foregoing to insist Chase was not obligated to procure insurance for the Bank pursuant to his conditional sales contract. The fact is that the insurance was provided by mutual agreement and the parties are bound by its provisions.

Next Rainier urges that the Bank became bound by the acts of Chase and Yung in their purported substitution of the National contract for the Rainier policy. The testimony shows that Chase procured the insurance and had the loss payable indorsement attached to the Rainier policy and caused the policy to be delivered to the Bank. When the National policy was acquired Chase also delivered that to the Bank. The Bank at all times retained both policies. This, insists Rainier, gave rise to a ratification of the transaction by Chase.

In a supplemental memorandum, Rainier placed emphasis upon the case of *Wells Petroleum Co.* v. *Fidelity-Phenix Fire Ins. Co.*, 121 F.Supp. 739, decided only a few months ago. In that case, the substitution was made by a broker who admittedly acted as agent for the insured. And most important as the distinguishing feature, the court related (at p. 743) that "Ratification of the replacement and substitution of the original policies was made by the insured long prior to the occurrence of the fire . . ." That element

plus confirmation by virtue of suing on the substituted policies was held to imply a cancellation of the original policies.

In this case, however, there is no testimony of any act by the Bank indicating that it had accepted the substitution or ratified the conduct of the insured and the agent in making the purported substitution. Nor may we infer a ratification by the Bank bringing in this lawsuit a cross-complaint for declaratory relief naming both insurance companies as parties cross-defendant. The rights of the Bank became fixed at the moment of the loss, and clearly as of that date the Bank had no knowledge of the negotiations or transactions between Chase and Yung. It therefore could not be bound by them.

Although Rainier has insisted that ratification resulted from the mere act of suing National as well as Rainier, it is interesting to note that the Bank in proceeding against both carriers on its cross-complaint was actually benefiting Rainier. For not having been informed of the proposed substitution within 10 days, the Bank, if compelled to make an election, would be obliged to choose Rainier as the company responsible to it for the entire loss.

In *Pagliero* v. *Merchants Fire Assur. Corp.*, 169 F.2d 373, also relied upon by Rainier, the insured was attempting to make a double recovery for the single loss and the court properly held that the insured had made an election with regard to one policy, and could not recover on the other. Obviously that situation does not prevail in the instant case.

Finally Rainier claims the court erred in denying it subrogation of the mortgagee's rights. As a general proposition an insurer is not entitled to subrogation unless it discharges the entire mortgaged debt. (*J. D. Halstead Lbr. Co.* v. *Security etc. Co.*, 116 Cal.App. 679 [3 P.2d 52]; *Finnell* v. *Jas. H. Goodman & Co. Bank*, 156 Cal. 18 [103 P. 483]; 91 A.L.R. 855; 9 A.L.R. 1607; *Phoenix Ins. Co.* v. *First Nat. Bank*, 85 Va. 765 [8 S.E. 719, 17 Am.St.Rep. 101, 2 L.R.A. 667]; *Northwestern F. & M. Ins. Co.* v. *Fred T. Ley & Co.*, 238 App.Div. 255 [264 N.Y.Supp. 517].) As stated in *Maryland Cas. Co.* v. *Cincinnati C., C. & St. L. Ry. Co.*, 74 Ind.App. 272 [124 N.E. 774, 775]: "It is a general rule, applicable to actions based on the ground of subrogation, that such right does not exist, unless the whole debt involved has been paid. (Citing cases.) This rule applies to conventional as well as legal subrogation, unless the contract

by which such right is created provides otherwise. (Citing additional cases.)'' In this instance the loss payable indorsement contains an express provision that to be entitled to subrogation of the Bank's rights as against the insured, the insurer must ''pay to the Lien-Holder the whole principal sum and interest due or to become due from the insured on the obligation secured by the property . . .''

Rainier relies upon *Surratt* v. *Fire Ass'n. of Philadelphia,* 43 F.2d 467. There are several distinguishing features in that case, but primarily the policy involved differed in that it provided the company shall ''On payment to a mortgagee of any sum . . . to the extent of such payment be subrogated . . .'' That clearly varies materially from a policy providing for subrogation upon payment of ''the whole principal sum and interest due.''

In view of the pro rata clause in both the Rainier and National policies, neither company qualifies for subrogation, since neither can, nor has either indicated a willingness, to pay the whole principal sum and interest due or to become due from the insured. The court judgment, against each company for but a proportion of the total loss, is determinative of the issues of the case.

### The National Appeal

In his amended complaint Chase alleged in one paragraph that Yung was acting as his agent in dealing with Hitke and National. At the conclusion of the trial counsel for Chase moved to amend his complaint by deleting that provision. National contends the trial court erroneously granted the motion.

It appears from all of the pleadings that the issue was presented as to whether Yung in his negotiations regarding the National policy was an agent for National or was acting for Chase. Evidence was received on this subject during the course of the trial and no objection was made by any of the parties that such evidence was outside of the scope of the pleadings.

An amendment to conform to proof may always be made where the cause of action is not changed thereby. (*Mays* v. *Wann,* 96 Cal.App. 760, 764 [274 P. 1020].) Such an amendment may be made either during the trial or after all the evidence has been presented. (*Lee* v. *Murphy,* 119 Cal. 364 [51 P. 549, 955].) Amendments to conform to the proof are liberally allowed under our practice. (*Genger*

v. *Albers,* 90 Cal.App.2d 52 [202 P.2d 569]; *Groover* v. *Belmont,* 114 Cal.App.2d 623 [250 P.2d 686].)　　The power to allow amendments in the interest of justice is uniformly held to be in the discretion of the trial court. (*Mays* v. *Wann, supra; Gartland* v. *C. A. Hooper & Co.,* 177 Cal. 414, 422 [170 P. 1115].)　　No abuse of discretion is shown here. If the court were convinced the evidence established Yung's agency for National and this were not indicated in the pleadings, the court would have had the power to direct the pleadings to be amended to conform thereto. (Code Civ. Proc., § 470; *Firebaugh* v. *Burbank,* 121 Cal. 186, 193 [53 P. 560]; *Genger* v. *Albers, supra.*)

But, on the contrary, maintains National, the evidence does not establish that Yung was its agent. There were conflicts in the evidence on this subject. But Yung's testimony and oral declarations of agency were supported by his receipt of an agent's commission and a formal written appointment as an agent, delivered to Yung on July 24, the very day on which he received the written policy for Chase. The relationship of the two events seems to be an irrefutable circumstance.

The evidentiary conflict was resolved by the trial court in favor of Yung's agency for National. We see no reason to disturb that finding, since it is supported by substantial evidence.

The principal issue raised by National is the trial court's finding of liability on an actual cash value basis, which in this case was established at $21,000, rather than on a stated amount value basis of $14,000.

Donald Groves, an underwriter employed by Hitke, testified that his office was requested by written application for merely $14,000 coverage. He stated that he sent quotation rates to Yung; that Yung subsequently telephoned him and sought nothing other than the $14,000 policy. Yung testified that Groves told him he had bound the coverage for $14,000 on fire and theft. Leland C. Friel, a broker for Lloyds of London, testified that customarily long haul insurance or trucking insurance is not written on any but a stated amount basis. Groves further testified that his company did not write insurance of this kind except on an actual cash value basis.

On the other hand testimony was uncontradicted that only Yung dealt with Chase and that Chase had no knowledge of any special requirements or limitations on the part of

Hitke or National. Yung testified he understood Chase wanted actual cash value coverage, eliminating only the distance restriction of the type contained in the Rainier policy. Yung told Chase prior to the loss that he had obtained the desired insurance with National and that Chase was fully covered in accordance with his instructions. As to the application form, containing numerous misstatements, the record indicates that Yung filled this out and signed Chase's name thereto without Chase's knowledge or approval. Thus it seems clear that the representations contained in the application, even if material and false, were those of the National agent, not of Chase. Testimony was offered by Chase that there was a general custom in the insurance business in Southern California to write liability risks in the amount of actual cash value less any agreed deductible sum.

As thus very briefly indicated, there was an irreconcilable conflict in the evidence concerning National's coverage for the actual cash value. The trial court found that Yung was the agent for National and Hitke, acting within the course and scope of his agency, that the general custom in this area permitted liability insurance to be written in the amount of actual cash value less an agreed deductible item and that in this instance National was bound by the acts of its agent in contracting for a policy in the amount of actual cash value. (See *State Farm Mut. Auto Ins. Co. v. Porter,* 186 F.2d 834, 841-842.) We see no reason to resolve this conflicting evidence in any manner other than that reached by the trial court, a conclusion amply supported by the evidence.

The law permits insurance coverage to be contracted by oral request and oral acceptance or ratification by an authorized agent. (*Guipre v. Kurt Hitke & Co.,* 109 Cal. App.2d 7, 15 [240 P.2d 312].)

Finally National complains about the assessment of interest from September 1, 1950, the date on which the court found National to have repudiated any and all liability. With regard to Rainier the date was fixed at November 30, 1950. The interest, National maintains, should run only from the date of judgment.

The trial court found that Chase had promptly notified National and Rainier of the total damage to the insured equipment. That the equipment had a fair market value of $21,000 was apparently uncontradicted in the evidence. No defense was interposed at the trial on the ground of the requirements of the policy as to a formal proof of

loss. The companies waived any such defense by totally repudiating any obligation or liability on their policies. As stated in *Grant* v. *Sun Indem. Co.*, 11 Cal.2d 438, 440 [80 P.2d 996] : "It is a well-recognized rule, which we conclude is applicable to the special circumstances here, that the insurer may not repudiate the policy, deny all liability, and at the same time be permitted to stand on a provision inserted in the policy for its benefit." ▆ Under these facts, Chase was entitled to interest at the legal rate to be calculated from the date when the companies should have made payment under their policies, which date is not later than that on which they repudiated liability or finally refused to pay.

▆ National insists, however, that the damages were not certain or capable of being made certain by calculation, as required by section 3287 of the Civil Code. It relies upon *Perry* v. *Magneson*, 207 Cal. 617 [279 P. 650], which held in a suit on a bond that the surety could not know the extent of the loss until determined by court and the claim was therefore uncertain and unliquidated until final judgment. In that case, however, the amount of the loss consisting of the cost to the owner in completing the building, was in dispute. It was therefore necessary for the court to determine whether there had been a loss and the amount thereof before the obligation of the bonding company was fixed. The reason for denying interest on claims is that where the person liable does not know what sum he owes, he cannot be in default for not paying. (*Cox* v. *McLaughlin*, 76 Cal. 60, 67 [18 P. 100, 9 Am.St.Rep. 164].) When the exact sum of the indebtedness is known or can be ascertained readily, the reason suggested for the denial of interest does not exist. (*Courteney* v. *Standard Box Co.*, 16 Cal.App. 600, 615 [117 P. 778].) In the instant case the evidence was undisputed that the equipment was totally destroyed. National took charge of the salvage and could ascertain from it and from list prices on the equipment what the fair market value was on the date of loss. Resort may be had to appraisers if necessary (*Koyer* v. *Detroit F. & M. Ins. Co.*, 9 Cal.2d 336, 345 [70 P.2d 927]), and other means to arrive at fair market value. ▆ The mere unwarranted denial of the validity of the contract, or liability thereunder, on the part of the insurance company will not have the effect of defeating the right to recover interest otherwise recoverable. (*Jacobs* v. *Farmers' Mut. Fire Ins. Co.*, 5 Cal.App.2d 1, 12 [41 P.2d 960].)

### The Bank and Chase Appeals

Both the Bank and Chase have filed appeals admittedly motivated by an excess of caution. Their only point on appeal is that the court should have held both companies fully liable, with protective provisions against double recovery, rather than to prorate their liability.

The loss payable indorsements attached to both policies provided that if there be other insurance the companies shall bear liability only for the proportion of such loss or damage that the insurance bears to the whole amount of valid and collectible insurance on the property. Both the Bank and Chase maintain that there was no evidence as to the ability of either company to respond to the judgment and therefore nothing to indicate the other insurance was "valid and collectible."

Conversely, there was no testimony with regard to either policy indicating the "other insurance" was not valid and collectible. Since Chase was the plaintiff and the Bank a cross-complainant, the burden was on both of them as moving parties to produce testimony on that subject. The court properly concluded, in the absence of any testimony to the contrary, that both policies were collectible and therefore subject to proration.

### Yung and Maulhardt

Yung has filed three responding briefs and Maulhardt one. While they were helpful to the court, essentially they indicated satisfaction with the judgment and raised no substantive points requiring further discussion.

The judgment is affirmed.

White, P. J., and Doran, J., concurred.