[Civ. No. 19209. First Dist., Div. One. Jan. 30, 1961.]

CHARLES J. BENTON, Plaintiff and Respondent, v. CRAVENS, DARGAN AND COMPANY (a Partnership) et al., Defendants and Appellants.

[Civ. No. 19312. First Dist., Div. One. Jan. 30, 1961.]

CHARLES J. BENTON, Plaintiff and Appellant, v. CRAVENS, DARGAN AND COMPANY (a Partnership) et al., Defendants and Respondents.

David Livingston, James R. Mansfield and Peter F. Sloss for Appellants in No. 19209 and Respondents in No. 19312.

Francis T. Cornish for Respondent in No. 19209 and Appellant in No. 19312.

DUNIWAY, J.—Two appeals are before us. In No. 19209, the appealing defendants are Cravens, Dargan & Company, and A. E. Stewart, on behalf of himself and certain underwriters at Lloyd's, London. Their appeal is from the judgment as a whole. In No. 19312, the appealing plaintiff is Charles J. Benton. He appeals from that portion of the judgment which limits his recovery to $3,000 plus interest. The appeals have been briefed and argued together, and will both be disposed of in this opinion.

I. THE APPEAL OF STEWART AND CRAVENS, DARGAN.

A. THE FACTS.

The controversy is primarily between two insurers, and arises from the theft of a GMC-Kenwood tractor. One policy, which is called the LEB policy, was issued by defendants Douglas Arthur Cole and Andrew Weir Insurance Company. It named Norma Minor as the assured and Bank of America, its successors and assigns, as loss payee. The other, which is called the LC policy, was issued by A. E. Stewart on behalf of himself and other underwriters at Lloyd's. It was obtained by Benton, written through Cravens, Dargan & Company, and named Norma Minor and Manuel Oliver as the assured and Benton as the loss payee. Both policies insured the vehicle against theft, the LEB limit being $6,000 and the LC limit, $7,000.

Norma Minor purchased the tractor, subject to a conditional sales contract held by Bank of America. When she purchased, the LEB policy was then in effect, and it was amended to cover the vehicle, and the loss payee clause, recognizing Bank of America, was added. On March 19, 1953, Minor and

Oliver formed a partnership as Minor Trucking Company, and the tractor was contributed to the partnership by Minor. The partnership borrowed $15,000 from Benton and gave him a note and a chattel mortgage which covered the tractor and other items. The proceeds of the loan were disbursed by Benton, and $6,832.82 thereof was paid to Bank of America, which delivered to Benton the conditional sales contract and pink slip for the tractor, and the LEB policy. There was no written assignment of the conditional sales contract or the policy; they were merely physically delivered to Benton.

Benton was an insurance broker, and asked that the partnership's insurance be placed through him. On March 19, 1953, he procured through Cravens, Dargan the LC policy, which covered all of the partnership equipment, including the tractor, and insured against theft and other risks. Benton was named as loss payee as to three vehicles, including the tractor, all of which were covered by his chattel mortgage.

The brokers through whom the LEB policy was procured had ceased to do business on January 1, 1953, and Cravens, Dargan succeeded them as the brokers who "serviced" the LEB policy, such service to include handling claims and cancellations. On the same day that he ordered the LC policy, Benton asked Cravens, Dargan to have the LEB policy cancelled. He was told that this could not be done without written authorization from the insured. Two days later, on March 21, Benton prepared an authorization and handed it to Minor, with instructions to sign it and send it to Cravens, Dargan. She did not do so (a fact which Benton did not know) and the LEB policy was not formally cancelled until May 13. None of the insurers had actual knowledge of Benton's request that the LEB policy be cancelled. No rider or endorsement was ever issued recognizing Benton as the loss payee under the LEB policy, nor did Norma Minor, the assured, assign it to him.

The tractor was stolen on March 23. Benton, on that day, prepared a loss report form, referring to the LEB policy number and sent it to Cravens, Dargan. The LC policy had not then been written or assigned a number. This form was returned to Benton. The tractor was recovered and stored at San Luis Obispo, whence it was again stolen between April 24 and 27. Cravens, Dargan was notified on June 15.

On May 7, another vehicle belonging to the partnership and described in both policies was involved in a collision. It was also subject to Benton's mortgage. He reported the loss to

Cravens, Dargan, and the loss was paid by two Cravens, Dargan checks, in equal amounts, one purporting to be issued under the LEB policy and one under the LC policy. Benton and the partnership knew that half the loss had been charged to each policy.

The court found most of the foregoing facts. It found that the LEB policy was in effect until March 18, but that when Minor, on that date, transferred the tractor and other equipment to the partnership, she did not intend to, and did not, transfer the LEB policy either to the partnership or to Benton. It also found that, on that date, the partnership, Benton, and appellant Stewart entered into an agreement, namely, the LC policy, through Stewart's attorney in fact, Cravens, Dargan. It found that, although requested to cancel the LEB policy, Cravens, Dargan did not do so until May 13, but that no interest in the policy was ever transferred to the partnership or to Benton, and that neither had any interest in that policy.

In connection with the payments made by reason of the May 7 collision, the court found that Cravens, Dargan had no authority to acknowledge that the LEB policy was in effect after March 18.

The value of the tractor was fixed by the court at $3,000.

The judgment is somewhat peculiar. It awards $3,000 to Benton, with interest at 7 per cent from March 19, and costs, against both Cravens, Dargan and Stewart, gives judgment against Benton on his claim against Cole and Andrew Weir Insurance Company, the LEB underwriters, and gives the latter their costs as against Cravens, Dargan and Stewart.

B. The Legal Questions.

1. *The judgment against appellants for costs.*

The judgment against Cravens, Dargan and Stewart for the costs of the LEB underwriters is clearly improper. This is conceded. (*Gibson* v. *Thrifty Drug Co.*, 173 Cal.App. 2d 554 [343 P.2d 610].)

2. *The judgment against Cravens, Dargan.*

The LC policy provides that Cravens, Dargan "is not one of the Underwriters or Assurers hereunder and neither is nor shall be in any way or to any extent liable for any loss or claim whatever . . ." In the face of this express provision, the judgment against them for the amount of the loss cannot stand, nor can Benton's judgment against them for costs. Benton attempts to suggest that somehow Cravens, Dargan

acted in bad faith in its relationship with the two sets of underwriters for whom it was acting. We cannot see how this could possibly give Benton a cause of action against Cravens, Dargan.

3. *The judgment against Stewart.*

■ It is not claimed that Benton is not entitled to any recovery as against Stewart, the LC underwriters. It is claimed that the loss should be apportioned, 7/13 against Stewart on the LC policy and 6/13 against the LEB underwriters, by reason of an apportionment provision in LC policy. The claim rests upon the contention that Benton was loss payee under the LEB policy, as a "successor" or "assign" of Bank of America, in its "capacity as conditional Vendor or Mortgagee" of the property insured. The quotations are from the loss-payee provision of the LEB policy.

The argument is that the LEB policy was not cancelled until May 13, and that Benton was, at the time of the loss, a loss payee under the policy. The first point may be conceded. The second, however, was determined against appellant, and we think that determination correct. Benton claims to be a successor or assign of the Bank of America, both in fact, and also in law because he paid off Minor's debt to the bank, thereby becoming subrogated to the right of the bank, and thus, in equity its successor or assign. He has no actual assignment from the bank, and the delivery to him of the policy, the conditional sales contract, and the pink slip are equivocal acts.

The court found against an assignment to Benton, and we think that its findings are supported. We also think that the equities do not compel a determination that Benton became subrogated to the bank's rights as against the LEB underwriters.

In this case, as in every other case, if the evidence sustains the findings of the court below, we cannot overturn those findings, whether we would have made the same findings or not. To succeed, appellant must demonstrate that, as a matter of law, the LEB policy was in effect and Benton was an assured under that policy. This question must be considered in light of the rule that an insurance policy such as the LEB policy does not, as is so often stated in the parlance of business, insure the property. It insures the interests in the property of the persons for whose benefit the policy is issued —those who are named in it as the assured. (See *Davis* v. *Phoenix Ins. Co.,* 111 Cal. 409 [43 P. 1115].) As is stated in

that case, the policy "does not, in the absence of special contract, run with the title or possession of the subject matter." (P. 415.) See also *Corder* v. *McDougall*, 216 Cal. 773 [16 P.2d 740]; *Alexander* v. *Security-First Nat. Bank*, 7 Cal.2d 718 [62 P.2d 735].

As to assignment: Most of the things that were done are inconsistent with assignment. No written assignment was made, either of the paper, if any, representing Minor's debt to the bank, or of the security. The loan made by Benton was not to Minor, the bank's debtor; it was to the partnership. It was used in part to pay Minor's obligations, but the purpose of doing so was to enable the partnership to function, using in part Minor's assets. Instead of taking over the bank's claim against Minor, Benton took a note from the partnership, not from Minor, and for the whole loan, not just the amount paid to the bank. He also took a chattel mortgage, to secure the note, and it covered the tractor and also other assets of the partnership. The chattel mortgage is inconsistent with the retention of the conditional sales contract; rather, the chattel mortgage was a new security to Benton, apparently considered sufficient by him. Nor did Benton do anything to assure himself that he would be recognized as loss payee under the LEB policy. On the contrary, partly for his own profit as an insurance man, he ordered and obtained new insurance, the LC policy, and at the same time asked that the LEB policy be cancelled. He got exactly what he bargained for both as to security and as to insurance of his rights, and the court could find that he did not bargain for the security of the conditional sales contract held by the bank or for its rights as loss payee under the LEB policy. (*Cf. Simon Newman Co.* v. *Fink*, 206 Cal. 143, 146 [273 P. 565]; *Brown* v. *Rouse*, 125 Cal. 645, 650-651 [58 P. 267]; *Guy* v. *Du Uprey*, 16 Cal. 195 [76 Am.Dec. 518]; *Moran* v. *Abbey*, 63 Cal. 56, 61.) He did get such rights under the LC policy, and the court properly enforced them.

Subrogation is not automatic. ▮▮▮▮ As has been stated by the Supreme Court: "Under these cases the conclusion seems inevitable that one who asserts a right of subrogation, whether by virtue of an assignment or otherwise, must first show a *right in equity* to be entitled to such subrogation, or substitution, and that where such right is clearly shown by the application of equitable principles, an assignment adds nothing to his right thereto. Otherwise stated, where by the application of equitable principles, a surety has been found not to be entitled to subrogation, an assignment will not confer upon him the

right to be so substituted in an action at law upon the assignment. His rights must be measured by the application of equitable principles in the first instance, his recovery being dependable upon a right in equity, and not by virtue of an asserted legal right under an assignment.'' (*Meyers* v. *Bank of America etc. Assn.*, 11 Cal.2d 92, 96-97 [77 P.2d 1084].) We can find no equities which would require the court to treat Benton as an assignee of the bank's rights through subrogation. He got a first lien on the tractor by taking the chattel mortgage, and there is no showing that his right has been jeopardized by any defect in the title to the tractor. Usually, if A lends money to B for the purpose of paying B's debt to C, he will be subrogated to C's rights against B only if this is necessary to protect the security given him by B. The typical case is one where C's first lien is paid off and B gives A what purports to be a first lien, but what turns out to be subordinate to an intervening lien without any fault on A's part. That is not this case.

Appellant also claims rights by estoppel—because the payment for the collision loss was paid in part by the LEB underwriters through Cravens, Dargan, after the theft that gave rise to this action. But we do not think these facts give rise, as a matter of law, to an estoppel in favor of the LC underwriters as against Benton, who is the respondent here. The fact that, in the case of the collision loss, the LC underwriters got the benefit of something to which they were not entitled, namely part payment of that loss by the LEB underwriters, does not raise an estoppel against Benton. It was of no moment to him which set of underwriters paid his loss. To require him, when the collision loss was paid voluntarily by both underwriters, to reject the LEB payment and litigate about it with the LC underwriters, in order to protect a claim for the full amount of the theft loss as against the LC underwriters, is to carry the doctrine of estoppel beyond reason. The notice of loss sent by Benton to Cravens, Dargan following the March 23 theft, and referring to the LEB policy, was never acted upon in any way. It certainly does not estop Benton as against the LC underwriters.

The cases on which appellant relies are not in point. They were cases in which the insurance company was held to have waived, or to be estopped to assert, certain policy defenses against one who was by the terms of the policy, the assured (*Baker* v. *Fireman's Fund Ins. Co.*, 79 Cal. 34 [21 P. 357]; *J. Frank & Co.* v. *New Amsterdam Cas. Co.*, 175 Cal. 293 [165

P. 927] [misnomer]). Here, the question is whether Benton ever became an assured under the LEB policy.

### 4. *The judgment for interest.*

■ The court was in error, however, in awarding interest from March 19, 1953. As the record shows, and as the court stated, the evidence as to the value of the tractor "range[d] from $2,500 to $7,000." The underwriters did not agree to pay a fixed sum of money, as in a contract of life insurance. They agreed to pay the actual cash value of the stolen tractor. This was, under the fact of this case, unliquidated, and pre-judgment interest should not have been awarded. (Civ. Code, § 3287; *Lineman* v. *Schmid*, 32 Cal.2d 204 [195 P.2d 408]; *Continental Rubber Works* v. *Bernson*, 91 Cal.App. 636 [267 P. 553].) The cases cited by Benton are distinguishable; in each, there was either no dispute as to the amount of the loss, or the amount recovered was substantially the amount claimed. (*Chase* v. *National Indemnity Co.*, 129 Cal.App.2d 853 [278 P.2d 68]; *Koyer* v. *Detroit Fire & Marine Ins. Co.*, 9 Cal.2d 336 [70 P.2d 927]; *Jacobs* v. *Farmers' Mut. Fire Ins. Co.*, 5 Cal.App.2d 1 [41 P.2d 960].) *Carlstrom* v. *Agricultural Ins. Co.*, (9 Cir.) 180 F.2d 286, makes precisely this distinction, in a case involving California law. In the present case the court found the actual cash value to be less than one-half the $7,000 demanded in the complaint.

### II. THE APPEAL OF BENTON

■ Benton claims that the court improperly admitted in evidence the deposition of one Gray, who testified as to the condition and value of the tractor at the time of the theft. The contention is that the deposition was noticed and taken by Benton, not the defendants, that on direct examination no questions were asked as to the condition or value of the tractor, that local counsel retained by Benton at San Luis Obispo, where the deposition was taken, were not prepared on these questions, but that nevertheless defendant's counsel proceeded to interrogate Gray on these questions. Reliance is placed upon former Code of Civil Procedure, sections 2021, 2031 and 2032 and on sections 2045 and 2048. However, when defendant's counsel offered the portion of the deposition to which objection is now made, the only objection was to the qualification of the witness to state an opinion. Any other objection was thereby waived. (*Murray* v. *San Leandro Rock Co.*, 111 Cal.App.2d 641, 647 [245 P.2d 347]; *Rau* v. *Redwood City Woman's Club*, 111 Cal.App.2d 546, 552 [245 P.2d 12].)

And there was sufficient showing of qualification to justify the court's admission of the testimony. We do not mean to intimate that the objection now raised is good; it is unnecessary and would therefore be improper to decide that question.

No other errors are urged by Benton.

The judgment is reversed in the following particulars only: (1) the portion which awards plaintiff interest at 7 per cent from March 19, 1953; (2) the portion which awards judgment for plaintiff against Cravens, Dargan & Company; (3) the portion which awards judgment to Douglas Arthur Cole and Andrew Weir Insurance Company Ltd. against Cravens, Dargan & Company and A. E. Stewart for their costs of suit. No new trial is required on any issue, and the court is therefore directed to modify its judgment in accordance with this decision, with costs to Cravens, Dargan & Company against plaintiff.

Cravens, Dargan & Company shall recover its costs on appeal against Benton. A. E. Stewart and Charles J. Benton shall each bear his own costs on appeal.

Bray, P. J., and Tobriner, J., concurred.