[Civ. No. 27293. First Dist., Div. Two. Apr. 20, 1971.]

EXECUTIVE AVIATION, INC., et al.,
Plaintiffs, Cross-defendants and Appellants, v.
NATIONAL INSURANCE UNDERWRITERS et al.,
Defendants, Cross-complainants and Appellants.

800

## COUNSEL

Kelso, Cotton, Seligman & Ray, Godfrey L. Munter, Jr., and Griffith L. Humphrey for Plaintiffs, Cross-defendants and Appellants.

Mullally & McCorkindale and Lawrence E. Mullally for Defendants, Cross-complainants and Appellants.

## OPINION

**TAYLOR, J.**—These cross-appeals arise out of an action by the insured, Executive Aviation, Inc. et al., against its liability insurer, National Insurance Underwriters et al., in an action for damages for the loss of an aircraft in a sales demonstration flight, and for declaratory relief concerning the extent of the insurer's obligation to defend a third party action filed by the heirs of the deceased purchaser. The insured appeals from those portions of the judgment in its favor denying prejudgment interest, and attorney fees in defense of the third party action, contending that damages were certain on the date of loss and that the insurer breached its obligation to defend because of an admitted conflict of interest. The insurer cross-appeals from the entire judgment, contending that the trial court erred in ruling that the flight in question was not in "air transportation" or "common carriage" under the Federal Aviation Act and in excluding extrinsic evidence to interpret Endorsement 14 of the insurance

policy, which restricted its application to aircraft operated by a pilot qualified for such flights. We have concluded that the judgment in favor of the insured should be affirmed, as modified, to include prejudgment interest and costs and attorney fees in the third party action. The latter is a matter of first impression in this state.

Viewing the record in favor of the judgment, the following facts appear: The insured was the operator of an aircraft sales and air taxi business located at the Oakland International Airport, and held an air taxi certificate issued by the Federal Aviation Agency for aircraft weighing up to 12,500 pounds. In May 1965 the insured acquired for speculation and resale from the Bechtel Corporation a twin-engine Lockheed Lodestar aircraft, No. 2222B, weighing 19,000 pounds, informed the insurer of the acquisition, and obtained coverage for the aircraft on its liability policy on the terms and conditions more fully set forth below. As the Lodestar was too large and heavy to be used under the insured's air taxi certificate for sales demonstration flights, a special demonstration agreement was executed. Between May 1965 and December 1966 the Lodestar had been taken on two sales demonstration flights for prospective purchasers.

Pursuant to the liability policy issued in June 1966 the insurer agreed: to pay on behalf of the insured all sums that the insured shall become legally obligated to pay as damages because of bodily injury, sickness or death, property damages sustained by any passenger arising out of the ownership or use of the Lodestar, as well as to pay for all physical loss or damage to aircraft while in flight, including disappearance of aircraft. The policy contained the usual provisions indicating that the insurer would defend any suit against the insured and reimburse the latter for all reasonable expenses. Prior to December 20, 1966, the policy was endorsed to specifically include flights to Mexico with bodily injury liability of $100,000 each person and $800,000 each occurrence. Endorsements 9 and 14 of the policy respectively provided that as to the Lodestar, the insurance applies when the aircraft is in flight "only while being piloted by any Pilot while holding a valid Private or Commercial Pilot Certificate with Appropriate F.A.A. Ratings for the operation being performed," and only while being operated by "Any Commercial Pilot Properly Rated in Type and Qualified for the aircraft and flight and having a minimum of 2000 flying hours experience as a Pilot."

In October 1966 Mr. R. Y. Dakin expressed an interest in the purchase of the Lodestar after being informed that the insured did not have for charter an airplane large enough to carry eight people. Dakin looked at the Lodestar and indicated that he was planning to build a home in Mexico, had a son who was a pilot, and might be able to utilize an aircraft. Dakin

again contacted the insured about two weeks after his initial visit. After some negotiations, the insured and Dakin agreed on a sale of the Lodestar at a purchase price of $85,000. Consummation of the transaction hung only on Dakin's being satisfied as to the avowed capabilities of the plane in a demonstration flight. Thereafter, on December 20, 1966, pursuant to the insured's usual written demonstration agreement, the Lodestar took off from Oakland for LaPaz, Mexico. The agreement provided that the cost of the demonstration flight ($2,390 plus $50 a day layover charges and $135 an hour for any additional flying), was to be paid by Mr. Dakin and credited against the purchase price. The aircraft, piloted by Elton C. Stone and carrying one other crew member and eight members of the Dakin family, departed from Oakland, refueled in San Diego, and was never heard of again. Presumably, it was lost or destroyed in the international waters off the Gulf of California, about 27 miles northwest of LaPaz, as several bodies were recovered there.

At the time of the accident, Stone had over 2,000 flight hours' experience as a pilot in command of the Lodestar aircraft and possessed a valid commercial pilot's license with an instrument rating. As the result of prior disciplinary proceedings, Stone's license certificate had, in 1963, been endorsed as "Invalid for use as a Pilot-In-Command in Air Transportation" so that he could not fly passengers in a large aircraft in common carriage for compensation or hire, but could fly private carriage operations, such as sales demonstration flights.

In February 1967 the insurer advised the insured that since Stone was not a qualified pilot pursuant to Endorsement 14, any defense of any claim would be subject to a reservation of rights. The insured commenced this action for declaratory relief and loss of the aircraft on May 17, 1967; the insurer answered by denying liability under the policy and cross-complained for the amount paid to the lienholder. Thereafter, on February 2, 1968, the Dakin heirs filed a wrongful death action against the insurer and the insured in admiralty in the United States District Court (No. 48632, hereafter the Dakin action). The insurer recognized that its position in the instant action was inconsistent and adverse to its position in the Dakin action.[1]

The trial court found that: the December 20, 1966 flight of the insured's Lodestar was not a flight in "air transportation" or "common carriage"; Stone was fully qualified for sales demonstration flights of the Lodestar

---

[1] A letter from the insurer's claims manager to the reinsurer stated: "We are faced with the paradoxical position of having to prove the insured a common carrier to avoid coverage, while such proof will jeopardize the defense of the passengers' actions."

and was an approved pilot within the terms and conditions of the policy, which was in full force and effect on December 20, 1966, when the aircraft disappeared. The court further found that the insurer breached its obligation by paying only the $19,770.12 to the lienholder[2] and refusing to pay the insured the value of its equity in the Lodestar, $50,229.88, as the agreed value of the aircraft on the date of its disappearance was $70,000. The court also found that the insurer was obligated to defend the insured in the Dakin action and provide indemnity for any judgment up to the liability limits of the policy, but denied the insured any interest prior to the judgment on the $50,229.88, and also denied the $2,325 sought for legal services rendered by its independent counsel in the Dakin action.

## I. THE INSURER'S CROSS-APPEAL

The insurer's main contention on its appeal is that the evidence does not support the trial court's finding that the flight was a sales demonstration flight and was not "common carriage" or a flight in "air transportation," as those terms are used in the Federal Aviation Act of 1958 (49 U.S.C.A. § 1301 et seq.), and the regulations issued pursuant thereto, by the Federal Aviation Agency (hereafter FAA).

The pertinent provisions of the Federal Aviation Act (49 U.S.C.A. § 1301, subd. (21)), and the then applicable regulations (14 C.F.R., part 1) define air transportation as the carriage by an aircraft of persons or property as a common carrier, for compensation or hire, between any place in the United States and any place outside the United States.

Neither the language of the statute nor the regulations define *the common carriage* to which the economic regulations apply (*Las Vegas Hacienda, Inc.* v. *C.A.B.,* 298 F.2d 430, 437). Rather, the cases have relied on common law precedents, wherein the dominant factor in fixing common carrier status is the presence of a holding out to transport the property or person of any member of the public who might choose to employ the proffered service (*Stimson Lumb'r. Co.* v. *Kuykendall,* 275 U.S. 207, 211-212 [72 L.Ed. 241, 244-245, 48 S.Ct. 41]). The test applied by the FAA is an objective one relying on what the carrier actually does, rather than upon the label that the carrier attaches to its activity or the purpose which motivates it (*Alaska Air Transport* v. *Alaska Airplane Charter Co.,* 72 F.Supp. 609). However, a common carrier may at times and for certain purposes become a private carrier or a bailee for hire, when as a matter of accommodation or special engagement he under-

---

[2]The insurer's defenses against the insured could not be asserted against the lienholder, who was paid in full.

takes to carry something which it is not his business to carry (*Pacific Northern Airlines* v. *Alaska Airlines,* 80 F.Supp. 592, 601).

The insurer, relying on *World Airways, Inc.* v. *Northeast Airlines, Inc.,* 349 F.2d 1007,[3] argues that the December 20, 1966 flight of the Lodestar was, therefore, a flight in air transportation and subject to the exception of Endorsement 14 because of the limitation on Stone's license.

■ Although the insured had the burden of proving the contract of insurance and its terms, as well as the loss, the burden of bringing itself within any exculpatory clause contained in the policy is on the insurer (*American Home Assurance Co.* v. *Essy,* 179 Cal.App.2d 19, 23 [3 Cal. Rptr. 586]).

■ We cannot agree with the insurer's contention that the question is one of law. The insurer's argument ignores the fact that the FAA exempts air taxi operations, like the insured, from certain aspects of its economic regulations. Furthermore, the FAA views the question as one of fact. The amicus curiae memorandum prepared by the FAA's regional counsel and part of the record below, stated: "Normally, *and depending upon the facts involved,* sales demonstration flights are not considered 'common carriage,' and therefore not 'air transportation' as those terms are used by the Administration in its administration of the Federal Aviation Act. That is not to say, however, that an air taxi operator could not conduct 'air transportation' and at the same time and on the same flight conduct a sales demonstration." (Italics added.)

This view was consistent with that taken by the FAA with respect to the effect of the endorsement on Stone's license, which prevented him from being in command of air transportation flights in common carriage on large (over 12,000 pounds) aircraft, but permitted him to make sales demonstration flights in such aircraft.[4] The contemporaneous construction of a statute by an administrative agency is entitled to respect and should be followed unless contrary to law (*DiGiorgio Fruit Corp.* v. *Dept. of*

---

[3]Interestingly, none of the authorities cited by the insurer relate to factual situations similar to the instant one, but involve so-called charter air lines providing transportation beyond the particular limitations of their certificates or attempts of carriers to operate passenger or cargo services free of any regulation such as *Consolidated Flower Shipments* v. *Civil Aeronautics Bd.,* 213 F.2d 814. More pertinent is *Somlo* v. *C.A.B.,* 367 F.2d 791, which held that a commercial pilot who flew his family and domestic servant in a plane for which he was not rated violated a regulation prohibiting carrying of passengers other than of the category and class for which he was rated. In the instant case, the insurer conceded that Stone was qualified to fly the Lodestar and had the requisite number of hours, but argued that the restriction on his license prevented him from being qualified for the flight in air transportation.

[4]The 1963 communication from the FAA to Stone concerning the endorsement indicated that private carriage operations or executive transportation were excluded from the term "air transportation" used in the endorsement.

*Employment,* 56 Cal.2d 54 [13 Cal.Rptr. 663, 362 P.2d 487]; *Mudd* v. *McColgan,* 30 Cal.2d 463 [183 P.2d 10]; *The Pocket Veto Case,* 279 U.S. 655 [73 L.Ed. 894, 49 S.Ct. 463]). The trial court properly treated the question as one of fact.

■ Thus, the question is whether there was substantial evidence from which the trial court could find that the flight of the Lodestar was a bona fide sales demonstration flight and not in "air transportation" or "common carriage." As indicated above, the Lodestar was acquired by the insured for investment and sales purposes, as the aircraft was too heavy to be operated under the insured's air taxi certificate. The insured in all of its advertisements to the public indicated that its service included the sale of aircraft, as well as the rental of aircraft and air taxi services. The Lodestar had been taken on two other sales demonstration flights for prospective purchasers prior to the flight of December 20, 1966. Each time, demonstration flight agreements, whereby the cost of the demonstration flight would be deducted from the purchase price, similar to that signed by Mr. Dakin, were used. In October, Mr. Dakin expressed an interest in purchasing the Lodestar after being informed that the insured had no aircraft for rent or charter that would be large enough to accommodate the size of the Dakin party. A purchase price of $85,000 was agreed upon after negotiations, and the consummation of the sale hinged only on Mr. Dakin's satisfaction as to the avowed capabilities of the aircraft in a demonstration flight. We conclude that there was ample substantial evidence to support the trial court's finding that the December 20, 1966 flight of the insured's "Lodestar" was a bona fide sales demonstration or common carriage, and Stone was a qualified pilot. Accordingly, the insurer has not met its burden of showing that the particular facts of the December 20, 1966 flight bring it within the exceptions of the exculpatory provision of Endorsement 14 of its policy.

■ The insurer also argues that the trial court erred in excluding its extrinsic evidence to explain the meaning of the term "pilot qualified for the aircraft and flight" in Endorsement 14 of the policy. The record indicates that on the second day of trial, the insurer called Mr. Gifford as an expert in the field of underwriting and aviation insurance risks. When the insurer sought to elicit the expert testimony, an objection on the ground of irrelevance was interposed and properly sustained as the terms of the policy indicated that *qualification was defined therein with reference to the FAA's regulation and licensing of pilots.*

The record further indicates that Mr. Gifford was not qualified as an expert witness and no hypothetical question had been put to him. The only questions related to his personal practices in writing similar liability insur-

ance for a different company. From the questions asked and answered by the witness, it was apparent that he had no personal knowledge as to the particular policy and endorsement. We conclude that the proffered testimony was properly excluded.

## II. THE INSURED'S APPEAL

■ Briefly, we turn to the insured's contention that the trial court erred in failing to award prejudgment interest for the property damage to the airplane from the date of loss. Pursuant to Civil Code section 3287, prejudgment interest is recoverable on damages "certain, or capable of being made certain by calculation," from the day on which the right to receive them vested. The California courts have interpreted this provision to permit recovery of interest on damages recovered by an insured from the insurer from the date on which payment was due under the terms of the insurance contract, where the insured had by such time *furnished the insurer with data from which the loss could be ascertained* and where such data was not substantially disputed by the insurer (*Chase* v. *National Indemnity Co.,* 129 Cal.App.2d 853, 865 [278 P.2d 68]).

We see no merit in the insurer's contention here that the value of the aircraft was uncertain until it stipulated thereto at the time of trial. The complaint sought $70,000, $50,000 of which represented the insured's equity in the aircraft, and the balance, the lienholder's interest. The insurer's answer denied liability and also denied that $70,000 was the fair market value of the plane. Prior to trial, the insurer's claims manager recognized and admitted that the value of the aircraft on the date of the loss was $70,000. Also, prior to trial, the insurer had paid the lienholder's claim. At the trial, the insurer presented no evidence to contradict the $70,000 and stipulated that it was the value of the Lodestar on the date of loss. Under these circumstances, it is well established that the insured is entitled to interest at the legal rate to be calculated from the date on which the insurer denied liability, February 20, 1967 (*J. J. Newberry Co.* v. *Continental Cas. Co.,* 229 Cal.App.2d 728 [40 Cal.Rptr. 509]; *Chase* v. *National Indemnity Co., supra*).

■ The insured's major contention is that under the policy defense clause, it is entitled to reimbursement for the reasonable value of the legal services rendered by its independent counsel. As indicated above, the trial court found that the insurer recognized the conflict of interest between its position in the instant case and in the Dakin action, and that the insurer was obligated to defend and indemnify the insured in the latter action. But the court denied the insured's request for its attorney fees and costs in

the Dakin action and thus impliedly found that the insurer had adequately performed its obligation to defend the insured therein.

Although it is well settled that an insurer must defend its insured pursuant to the provisions of its contract (*Gray* v. *Zurich Insurance Co.,* 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d 168]) and do nothing that would injure the interests of its insured (*Lysick* v. *Walcom,* 258 Cal. App.2d 136 [65 Cal.Rptr. 406, 28 A.L.R.3d 368]), the extent of the insurer's obligation in a conflict of interest situation, like the one here presented, has not been previously faced by a California appellate court.[5] The Rules of Professional Conduct of the State Bar state: "A member of the State Bar shall not accept professional employment without first disclosing his relation, if any, with the adverse party, and his interest, if any, in the subject matter of the employment." (Rule 6.)

Our search of the case law and scholarly works dealing with this particular problem indicates a lack of unanimity as to the proper answer (see Keeton, *Ancillary Rights of the Insured Against His Liability Insurer,* 28 Ins. Counsel J. 395; Appleman, *Conflicts in Injury Defenses,* 1957 Ins. L.J. 545; Keeton, *Liability Insurance and Responsibility for Settlement,* 67 Harv.L.Rev. 1136; Note, *Use Of The Declaratory Judgment To Determine A Liability Insurer's Duty To Defend—Conflict Of Interests,* 41 Ind.L.J. 87; *The Insurer's Duty To Defend Under A Liability Insurance Policy,* 114 U.Pa.L.Rev. 734; *The Insurer's Duty To Defend Made Absolute,* 14 U.C.L.A. L.Rev. 1328, 1332). A reasonable solution was proposed by the New York Court of Appeals in *Prashker* v. *United States Guarantee Company* (1956) 1 N.Y.2d 584 [154 N.Y.S.2d 910, 136 N.E.2d 871], namely, that where a conflict of interest has arisen between an insurer and its insured, the attorney to defend the insured in the tort suit should be selected by the insured and the reasonable value of the professional services rendered assumed by the insurer. If the insured and the insurer are represented by two different attorneys, each of whom is pledged to promote and protect the prime interests of his client, adequate representation is guaranteed and the deleterious effect of the conflict of interest imposed on an attorney who attempts the difficult task of representing both parties is averted.

Here, the record indicates that after the filing of the Dakin action, the insurer first retained the same firm of attorneys to defend its interest and that of the insured in that action as was already defending the insurer in

---

[5] In *Gray* v. *Zurich, supra,* the conflict of interest argument was raised by the insurer but rejected by the court which found that under the circumstances of that case, the conflict of interest could be avoided procedurally. *Pennix* v. *Winton,* 61 Cal.App.2d 761 [143 P.2d 940, 145 P.2d 561], held that counsel was guilty of misconduct in continuing to act for an insured while acting solely in the interest of the insurer.

the instant matter. Subsequently, the insurer attempted to engage another firm[6] to represent the insured in the Dakin action, but the extent and scope of this representation was not clarified. The insured had no say in the choice of counsel to defend its interests. In addition, the insurer's claims manager admitted that due to the "unusual" nature of the case, he segregated the files relating to this matter and refused to turn over all of its files to the second firm selected by the insurer to defend the interest of the insured in the Dakin action. When asked in court to produce the missing portions of the file, the insurer asserted privilege. The approach discussed above would prevent the confusion exhibited by the record here with respect to the selection of counsel for the insured and the insurer's admittedly unusual practice concerning the segregation of its files.

We hold, therefore, that in a conflict of interest situation, the insurer's desire to exclusively control the defense must yield to its obligation to defend its policy holder. Accordingly, the insurer's obligation to defend extends to paying the reasonable value of the legal services and costs performed by independent counsel, selected by the insured (*Employers' Fire Insurance Company* v. *Beals* (1968) 103 R.I. 623 [240 A.2d 397]). While an insurer may be dismayed at having to pay the cost of two attorneys for one action, we are cognizant that the necessity for this action stems from its failure to provide with any degree of clarity for this conflict of interest contingency in drafting the terms of its contract. ■ Under well established principles (*Gray* v. *Zurich, supra;* 4 Williston, Contracts (3d ed.) § 621, pp. 764-765), the words of an insurance contract are construed against the insurer. ■ We conclude that the insured here is entitled to the reasonable value of the legal services rendered by its independent counsel and the costs in the Dakin action.

The judgment in favor of the insured, as modified to include interest from the date of the insurer's denial of liability and the attorney fees and costs in the Dakin action, is affirmed. The insured is to recover costs on appeal.

Shoemaker, P. J., and David, J.,* concurred.

On May 11, 1971, the judgment was modified to read as printed above.

---

[6]One well known for its insurance defense practice.

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.