[L.A. No. 29560. In Bank. May 1, 1968.]

JIMMY LEE SMITH, Petitioner, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; THE PEOPLE et al., Real Parties in Interest.

Irving A. Kanarek for Petitioner.

John D. Maharg, County Counsel, and William F. Stewart, Deputy County Counsel, for Respondent.

No appearance for Real Parties in Interest.

MOSK, J.—Defendant Jimmy Lee Smith petitions for a writ of mandate to compel the Los Angeles Superior Court to vacate its order removing I. A. Kanarek as his attorney of record in a pending murder trial.

We adjudicate here the unprecedented issue of whether a trial judge has or should have the power to remove a court-appointed defense attorney, over the objections of both the attorney and the defendant, on the ground of the judge's subjective opinion that the attorney is "incompetent" because of ignorance of the law to try the particular case before him. We conclude that such a ruling is beyond the statutory and inherent powers of the trial court, and hence that the writ should be granted.

In 1963 Smith and his codefendant, Gregory Ulas Powell, were charged with the murder of Los Angeles Police Officer Ian Campbell. Defendants were indigent, but a conflict prevented the public defender from representing both; Ray L. Smith, a private attorney, was therefore appointed to represent defendant Smith at the trial. Defendants were found

guilty of first degree murder, and the death penalty was imposed on each. Mr. Kanarek entered the case on October 1, 1963, when on motion of defendant Smith he was appointed to represent Smith in arguing the motion for new trial. That motion was denied, and judgment was entered.

Thereafter, we appointed Mr. Kanarek to represent Smith on his automatic appeal. The appeal was successful, and on July 18, 1967, we reversed the judgments as to both defendants for violation of the *Escobedo-Dorado* rules. (*People* v. *Powell* (1967) 67 Cal.2d 32 [59 Cal.Rptr. 817, 429 P.2d 317].)

Our appointment of Mr. Kanarek expired, of course, with the final determination of the appeal. Accordingly, the question of Smith's representation on the retrial was promptly raised when the cause was returned to the Los Angeles Superior Court for further proceedings. At a hearing on September 1, 1967, before Judge Mark Brandler, who had presided at the trial, the following took place:

"THE COURT: Is it your desire, Mr. Smith, that the Court appoint Mr. Kanarek who represented you in connection with the appeal of this case before the Supreme Court, that he be appointed to represent you in connection with the retrial of this case?

"DEFENDANT SMITH: Yes, your Honor.

"THE COURT: Have you given any thought to this type of appointment, Mr. Kanarek, with reference to retrial as to Mr. Smith?

"MR. KANAREK: Yes, your Honor.

"THE COURT: Are you willing and prepared to accept an appointment?

"MR. KANAREK: Yes, your Honor.

"THE COURT: I take it, in connection with the preparation of this case on appeal, *you became thoroughly familiar with all of the transcripts, numerous transcripts in the case and the numerous legal points involved?*

"MR. KANAREK: Yes, your Honor.

"The Court: All right. *In view of all of that background* and the fact the defendant does not have the funds to employ private counsel, there being a conflict which heretofore existed and so certainly, the Public Defender would not be in a position to represent conflicting interests, the Court will appoint Mr. Kanarek to represent the defendant Mr. Jimmy Lee Smith pursuant to the provisions of Section 987a of the Penal Code." (Italics added.)

Between September 1 and December 28, 1967, inclusive, Mr. Kanarek appeared for Smith at 11 hearings on various pre-

trial motions. He actively participated in the presentation and argument of such motions, before several different judges. On December 28 the cause was transferred for trial to Department 78, Judge Arthur L. Alarcon presiding, and continued to January 22, 1968.

On the latter date Judge Alarcon entered the case for the first time. In the course of argument on a severance motion, an abrasive colloquy arose by reason of an apparent compulsive tendency of Mr. Kanarek to interrupt before Judge Alarcon had finished speaking. The judge admonished him in this regard, and after further argument the proceedings were continued to the following day.

At 9:45 a.m. on January 23 the hearing was resumed. Friction again developed between Judge Alarcon and Mr. Kanarek, and the judge warned on three occasions that his bailiff would enforce courtroom decorum if it became necessary. When Mr. Kanarek requested a continuance to do further research on points of law raised by the prosecution in opposing the motion to sever, Judge Alarcon abruptly asked, "Mr. Kanarek, have you ever tried a death penalty matter before as a trial lawyer?" Mr. Kanarek replied that he did not believe he had. After hearing cocounsel's similar request for a continuance, Judge Alarcon on his own motion injected the issue of Mr. Kanarek's "competency" into the proceedings, by announcing: "There is a question that has come up in the Court's mind which I must resolve as to whether I feel Mr. Kanarek has the experience and the ability to represent Mr. Smith in a charge as serious as this. And I want to do some research as to that problem and confer with the presiding judge *and then hear from Mr. Kanarek*, if he wishes to be heard, and indicate my own opinion, whether my doubt has been resolved or not. If I find that Mr. Kanarek is not, by experience or training or knowledge, capable of representing Mr. Smith, he will be relieved and a new attorney will be appointed by the Court." (Italics added.)

Responding to the adverse implications of this totally unexpected expression of doubt as to his competency, Mr. Kanarek pointed to his representation of Smith on the motion for new trial and on the appeal, and said, "May I inquire as to whether the Court has read the record?" He was ordered to sit down. At the close of the morning session he apparently sought to renew his objection, saying, "Well, your Honor, I might state that your Honor's statements are denying a right to counsel to Mr. Smith. Mr. Smith has asked me to prepare

an affidavit of prejudice against your Honor because of your Honor's statements to me concerning this lack of —'' Judge Alarcon interrupted him at that point, calling a recess until afternoon and stating that "I'll hear from you at that time.''

When the court reconvened, however, Judge Alarcon opened the proceedings with the following ruling:

"I placed this matter on calendar at this time so that I might further consider the question raised in the Court's mind with reference to the competency of Mr. Kanarek to continue to represent Jimmy Lee Smith in this matter. During the noon hour, I conferred with the Presiding Judge of this Court, Judge Donald Wright. I also studied a previous Superior Court case, which is the case of People against Gerald Flanagin, Superior Court No. 314,298. The Flanagin matter was a case in which Mr. Kanarek was the attorney of record as retained counsel and in that matter there was a motion for a new trial. Among the reasons indicated by Judge A. Andrew Hauk, now of the Federal District Court, for his granting the motion for a new trial was the inadequacy of the representation of Mr. Flanagin in that case. Mr. Flanagin was charged in that case with possession of marijuana, one cigarette. There was a time estimate by the People of one day. The case took some two weeks to try.

"Mr. Kanarek has indicated to this Court that he has never appeared as the attorney of record in the trial of a death penalty case. I have considered Mr. Kanarek's behavior before this Court, his attempts to urge a motion for a severance. I feel Mr. Kanarek is not capable of representing Defendant Smith. In view of the very serious nature of the charge in this case, in view of the fact that a previous jury has found this defendant guilty of murder in the first degree and recommended the death penalty, this Court has a special duty to see that Mr. Smith gets the finest representation possible. In view of Mr. Kanarek's lack of experience in any death penalty case as a trial lawyer, in view of the finding of Judge A. Andrew Hauk that Mr. Kanarek was not competent to represent a defendant in a one-day marijuana possession case,[1] the Court at this time will vacate the order of Judge Mark Brandler appointing Mr. Kanarek pursuant to Section 987a of the Penal Code.

---

[1]In this proceeding Mr. Kanarek vigorously disputes Judge Alarcon's characterization of the basis for the ruling in *Flanagin*. It is claimed, rather, that a new trial was there granted because the judge was of the

"Mr. Kanarek is now relieved as —

"Mr. KANAREK: May I be heard, Judge?

"THE COURT: *No, Mr. Kanarek, you may not.*

"Mr. Kanarek is now relieved as the attorney of record. Mr. Kanarek is ordered to deliver to the clerk of the Court by Friday, January 26 by 4:00 p.m. all transcripts and all records which he has received in this matter. A violation of this direct order will be considered as a contempt matter.

"You are relieved, Mr. Kanarek." (Italics added.)

Judge Alarcon then appointed Attorney William A. Drake, who was present in the courtroom, to represent defendant Smith. Mr. Drake accepted the appointment, but Smith was not consulted. As soon as the opportunity arose, however, Smith voiced his unqualified objection to Mr. Drake's appointment:

"THE DEFENDANT SMITH: In all respect to the Court, please, may I have one second, please?

"THE COURT: You talk to Mr. Drake.

"THE DEFENDANT SMITH: I object to this attorney being appointed and I'd like to have the record reflect that, your Honor. I have some say so, I think.

"THE COURT: Mr. Smith, the record will indicate that you are opposed to the appointment of Mr. Drake. That protects you.

"THE DEFENDANT SMITH: Yes.

"THE COURT: Fine. The matter will be continued to January 30, 1968 at 9:30."

The remainder of the record is eloquent with respect to Smith's adamant position in this matter. At every subsequent

---

opinion that the defendant was not guilty, and it is emphasized that the case was subsequently dismissed while Mr. Kanarek was still attorney of record. As for Judge Alarcon's statement that "There was a time estimate by the People of one day. The case took some two weeks to try," such chronology could equally well result from a conscientious effort by counsel to present more than a perfunctory defense. Certainly no defense attorney is bound by the prosecutor's estimate of how long a trial will take, and that estimate is no indication of the simplicity or complexity of the case.

Even less convincing is Judge Alarcon's reliance on the fact that Mr. Kanarek has not previously tried a death penalty case. It is obvious that if attorneys were not permitted to try death penalty cases unless they had previously tried one such case, the number of attorneys "competent" to do so would be fixed, and indeed would steadily diminish through the inevitable process of attrition. But there are not two classes of attorneys in this state—those who have and those who have not tried a death penalty case. While prior experience in such cases is no doubt valuable, as in any area of the law, the courtroom door can never be closed to members of the bar who wish to shoulder the heavy responsibility of defending a man on trial for his life.

session of the pretrial proceedings, Smith either objected to the dismissal of Mr. Kanarek or sought to disqualify Judge Alarcon. In so doing he acted without the assistance of Mr. Drake, and indeed over the latter's objection in a number of instances.

Thus when court reconvened on January 30 Smith presented a written request for permission to make a motion to vacate the January 23 order of Judge Alarcon on the ground that it "is void, as being in violation of said defendant's rights guaranteed by the SIXTH and FOURTEENTH AMENDMENTS to the United States Constitution," and comparable provisions of the California Constitution. In support, Smith averred under penalty of perjury that "After nearly four and one-half years of intimate contact with my case (the reporter's transcript of the previous trial was some thirty-five volumes), Mr. I. A. Kanarek is indispensable to me, and I want Mr. Kanarek, and no other attorney, to represent me."

At the hearing Smith amplified on his objections both to the dismissal of Mr. Kanarek and to the appointment of Mr. Drake. After reviewing his long association with Mr. Kanarek on this case, Smith explained:

"Mr. Kanarek has had more than four years studying these transcripts. He's had many, many conferences with me and we have discussed this case in detail. We are agreeable—I agree with the defenses that he is going to take in the upcoming trial and I have all the faith in the world in him as an attorney. . . .

"Now, as far as my objections to Mr. Drake, your Honor, I would strongly object to Mr. Drake as my attorney under any circumstances and I've talked to Mr. Drake for a few moments in the attorney room and I asked Mr. Drake if he, himself, would disqualify himself to try this case, for reasons I gave to him, which, if necessary, I'll bring to the Court's attention, but I'd rather not because it is not a personal thing but it is—I don't see how Mr. Drake could possibly try my case. He is an ex-police officer, to begin with. And I'm accused of killing a police officer.[2]

"Now, when I spoke to him of this, your Honor, Mr. Drake informed me that this would make no difference to him. But to me it does. It makes a great deal of difference. *And I*

---

[2]In Judge Alarcon's subsequent colloquy with Mr. Drake, the latter acknowledged that he was formerly an officer of the Los Angeles Police Department. He is also president of the Criminal Courts Bar Association. We do not imply, of course, any criticism of Mr. Drake's manifest qualifications.

*immediately told Mr. Drake that I would not cooperate with him,* nothing personal. I would have nothing whatsoever that he could possibly—that I wish he wouldn't try my case under these circumstances.

"And he said he would leave it up to you. Mr. Drake did.

"Now, in dismissing Mr. Kanarek, your Honor, the Court did not—this Court did not inquire as to whether or not I cared to hire my own attorney or I had the funds to and I think that this is a prerequisite that should have been done, which it wasn't, . . .

"Just in conclusion, your Honor, whatever the Court may decide in this matter, as a defendant, I wish to make it absolutely clear that Mr. Kanarek was and is my choice of counsel. And that I believe that as the matter—that as the matter presently stands, that he is—that I am being denied due process of law as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution." (Italics added.)

In response, Judge Alarcon simply inquired of Mr. Drake, "do you feel that you could represent [defendant Smith] to the best of your ability despite the fact that he objects to your representation of him?" Mr. Drake replied in the affirmative, and the judge denied the motion to vacate the order.

Later in the same hearing Mr. Drake complained that Mr. Kanarek had visited Smith in jail on the very day he was relieved. After suggesting disciplinary action by the State Bar, Judge Alarcon made an order forbidding the sheriff to allow Mr. Kanarek to visit Smith in jail. Although recognizing an exception to this order in the event that Smith should request to see Mr. Kanarek for the limited purpose of employing him, Judge Alarcon remarked that "there is a question in the Court's mind as to whether, assuming that Mr. Smith wants to retain Mr. Kanarek, in view of the Court's finding that he is not capable of handling such a case, whether the Court can accept a motion for a substitution at this point. There is a doubt in my mind that he could represent him even if retained."

At the next court session (February 5) Smith again objected, saying:

"DEFENDANT SMITH: Yes, your Honor. I'd like to renew my motion made the last time I was at this Court and add that I refuse to accept Mr. Drake as my attorney and I still would like the Court to reappoint Mr. Kanarek my attorney, who in the first instance I chose to be my attorney.

"THE COURT: I think the record is very clear, Mr. Smith. You don't have to make that motion every day.

"THE DEFENDANT SMITH: I just wanted to—and further, your Honor, I'd like the Court to understand that *I shall not talk, consult or cooperate with Mr. Drake in any manner.* I have related this to Mr. Drake who seems to feel it doesn't matter and wishes to try this trial on the previous transcripts alone.

"THE COURT: All right, Mr. Smith. You may sit down.

"DEFENDANT SMITH: Thank you very much, your Honor.

"THE COURT: Now, you do not have to make that motion each day. You have made the point with the Court and it is in the record that you want Mr. Kanarek as your lawyer; that you don't want Mr. Drake; that you will not cooperate with him. I can't make you cooperate with Mr. Drake. You are on trial for your life. If you decide that you will not cooperate with Mr. Drake, that's your responsibility, not the Court's." (Italics added.)

At the following session (February 8) Smith attempted in vain to object to a ruling that all his documents and written motions in propria persona should first be submitted to Mr. Drake, and the court would "listen to [Mr. Drake's] opinion as to whether the Court should read it." Later in the hearing Smith was allowed to speak, and he advised Judge Alarcon that he would object only one last time. He said, "you are forcing me to proceed with this trial with an attorney who I really violently object to, really violently, and that *I will not cooperate, your Honor, but rather give up my life,* because I know my cooperation is important to this attorney. During the last trial, when we get into the record, your Honor will notice it, or if you have already read the records of the last trial, you will notice that there was no witnesses called in my behalf during the trial of this case, not one witness was called in my behalf. There was nothing that I thought that was even material introduced in evidence as to the trial itself of murder. I have witnesses. I've gotten this during these three years and nine months that I was on death row. And as a matter of fact, I have been in contact, Mr. Kanarek and I have witnesses, particular witnesses. I will not disclose these witnesses to this Mr. Drake because I don't have any confidence in him, your Honor." (Italics added.)

Smith then pointed out that he and Mr. Kanarek had prepared the motion to sever for five or six months, but that Mr. Drake's presentation of it was, in his opinion, both brief and

inadequate: "I think if it had been better presented to your Honor, that it would have been granted. That's why I put that motion in. I don't want to—I want to save my life. I don't want to die in the gas chamber. But by the same token, I would rather die in the gas chamber than continue with Mr. Drake as my attorney." Finally, Smith disclosed that through his relatives he was trying to raise money to hire his own attorney, and explained that "I am not doing this to try to slow down the proceedings in any way. I want it to go ahead myself. But I want a fair trial, your Honor. I really do. But I need a little time to get me an attorney if your Honor won't give me another one. Because *I don't have any confidence in Mr. Drake at all and I will not cooperate with him whatsoever.* . . . I can't cooperate and I will not and I won't change my mind under any circumstances and I plead with your Honor to either appoint me another attorney of your choosing, whom I—but anybody but Mr. Drake." (Italics added.)

Once again, Judge Alarcon's response was simply to cast the burden of this unfortunate situation on the defendant: "It is very clear to the Court that you have no confidence in Mr. Drake and it is very clear, at least now, you don't wish to cooperate with him. I think you are very foolish, very childish, but it is your life, Mr. Smith, and if you don't want to divulge to Mr. Drake the witnesses you say you have, and the evidence you say you have, and you wish to sit by and let a jury find you guilty and sentence you to the death penalty, there is nothing I can do about it."[3]

Why, one may well ask, did this impasse arise? As is so often true in such circumstances, neither party was wholly blameless. Mr. Kanarek's courtroom demeanor may have fallen short of customary standards in several instances; on the other hand, Judge Alarcon's reaction to such peccadillos seems to have been out of proportion to their gravity, and displays a degree of hypersensitivity to the rigors of advocacy. We do not condone intemperate behavior by counsel, for

---

[3]Smith apparently abided by his promise not to renew this objection. Instead, his efforts after February 8 were directed to achieving the disqualification of Judge Alarcon. After a challenge on the ground of bias (Code Civ. Proc., § 170, subd. 5) was heard and denied, he sought to file a peremptory challenge (Code Civ. Proc., § 170.6). We are informed that Judge Alarcon subsequently disqualified himself, and that Smith's trial has been severed from that of Powell and assigned to another judge. Mr. Drake, of course, has remained his nominal attorney of record throughout these maneuvers, although Smith has steadfastly refused to cooperate with him.

it "lessens the mastery of the trial judge over the progress of the proceedings and thus tends to obstruct the course of the trial." (*Gallagher* v. *Municipal Court* (1948) 31 Cal.2d 784, 795 [192 P.2d 905].) But as we also observed in that decision, "the heat of courtroom debate, particularly where liberty [or, *a fortiori*, life itself] is concerned, often gives rise to persistence on the part of counsel." (*Id.* at p. 797.) In view of counsel's high duty to his client, the wise judge will overlook or try to forgive any such excesses of zeal which do not seriously disrupt the proceedings before him. (See Frank, Courts on Trial (1949) pp. 410-415.) Patience and understanding, rather than punctilious insistence on courtroom etiquette, are the hallmarks of the judicial temperament. (See, e.g., Murphy, Elements of Judicial Strategy (1964) p. 210; Wyzanski, Whereas: A Judge's Premises (1964) p. 3.)

Regardless of who was at fault, however, the defendant must be given a fair trial. (See *People* v. *Powell* (1967) *supra*, 67 Cal.2d 32, 63.)

In this regard the record virtually speaks for itself. A complicated murder trial conducted under the circumstances here shown could scarcely fail to result in a mockery of justice, thus requiring still another reversal by this court and a third trial of the cause. ▮ If, however, Judge Alarcon's order of January 23 violated defendant Smith's right to counsel, mandate will lie to rectify the error before a constitutionally defective trial is undertaken: we recently reviewed the many cases adapting this remedy "to a spectrum of pretrial circumstances," and concluded that "It is neither novel nor inappropriate, therefore, for this court to review through a mandate proceeding a pretrial order which is likely to substantially affect a defendant's right to a fair trial." (*Maine* v. *Superior Court* (1968) *ante*, pp. 375, 378, 379 [66 Cal.Rptr. 724, 438 P.2d 372].)

Turning to the merits, we confront the basic question whether a trial judge has or should have the power to remove an attorney from a case on the ground here relied on by Judge Alarcon. The sole statutory authority for the removal of counsel is Code of Civil Procedure section 284.[4] That statute is applicable in criminal cases (*In re Martinez* (1959) 52

[4] "The attorney in an action or special proceeding may be changed at any time before or after judgment or final determination, as follows:

"1. Upon the consent of both client and attorney, filed with the clerk, or entered upon the minutes;

"2. Upon the order of the court, upon the application of either client or attorney, after notice from one to the other."

Cal.2d 808, 813 [345 P.2d 449]); but it obviously will not support the order of Judge Alarcon, for his ruling was predicated neither on the "consent" nor the "application" of Smith or Mr. Kanarek.

The issue, therefore, is whether a trial judge also possesses a nonstatutory, inherent power to make such an order over the objections of the defendant and his attorney. County counsel, as attorney for respondent court, correctly points out that it is the duty of the trial judge to protect the defendant's right to a counsel who is *effective*. But in discharging that duty the judge must be on his guard neither to infringe upon the defendant's right to counsel of his choice, nor to compromise the independence of the bar. It is upon these twin shoals that Judge Alarcon's order has come to grief.

All will agree that if the defendant's attorney exhibits objective evidence of *physical incapacity* to proceed with a meaningful defense of his client, such as illness, intoxication, or a nervous breakdown (see, e.g., *People* v. *Davis* (1957) 48 Cal.2d 241, 253-258 [309 P.2d 1]), the court need not sit idly by; it should inquire into the matter on its own motion, and if necessary relieve the affected counsel and order a substitution. Yet even that action should be taken with great circumspection and only after all reasonable alternatives, such as the granting of a continuance, have been exhausted. Failure to observe these standards, although in a case of undisputed physical incapacity of counsel, will compel a reversal of the ensuing judgment; and this result will follow regardless of whether the defendant's substituted counsel was competent or whether the defendant received a "fair trial" with respect to the guilt-determining process. (*People* v. *Crovedi* (1966) 65 Cal.2d 199 [53 Cal.Rptr. 284, 417 P.2d 868].) The value in issue, we said in *Crovedi*, is "the state's duty to refrain from unreasonable interference with the individual's desire to defend himself in whatever manner he deems best, using every legitimate resource at his command." (*Id.* at p. 206.)

With these considerations in mind, we turn now to the different and far more difficult question whether the foregoing power extends to the removal of counsel on the ground of the trial judge's subjective opinion that counsel is "incompetent" because of ignorance of the law to try the particular case before him. To begin with, we observe that the admission of an attorney to the bar establishes that the State deems him competent to undertake the practice of law before all our courts, in all types of actions. If that appraisal

turns out to be erroneous, we are the only court having jurisdiction to take direct action.[5] This does not mean, of course, that a trial judge is powerless when it appears to him that a defense counsel is making serious mistakes to his client's prejudice. At that point the judge may intervene, at least within reasonable limits, by disallowing pleas or motions to withdraw pleas, controlling the scope of examination, questioning witnesses himself, making appropriate suggestions as to the items or order of proof, commenting on the evidence, admonishing or instructing the jury on his own motion, or exercising any of his other inherent powers over the conduct of the proceedings to insure that the defendant receives a fair trial. (See *Cooper* v. *Superior Court* (1961) 55 Cal.2d 291, 301 [10 Cal.Rptr. 842, 359 P.2d 274], and cases cited.) Nothing we say here is meant to cast doubt on this practice.

 The judge's ultimate weapon, if counsel persists in rejecting such guidance in a contemptuous or insolent manner, is to invoke the summary contempt power. Yet that power too must be exercised with great caution, lest it stifle the freedom of thought and speech so necessary to a fair trial under our adversary system. That system is built upon the belief that truth will best be served if defense counsel is given the maximum possible leeway to urge in a respectful but nonetheless determined manner, the questions, objections, or argument he deems necessary to the defendant's case: "He has a right to press a legitimate argument and to protest an erroneous ruling." (*Gallagher* v. *Municipal Court* (1948) *supra,* 31 Cal.2d 784, 796.) Indeed, so essential is this "fundamental interest of the public in maintaining an independent bar" (*id.* at p. 795) that "a mere mistaken act by counsel cannot render him in contempt of court.

 Even if a legal proposition is untenable, counsel may properly urge it in good faith; he may do so even though he may not expect to be successful, provided of course, that he does not resort to deceit or to wilful obstruction of the orderly processes." (*Id.* at p. 788; see also *Cooper* v. *Superior Court* (1961) *supra,* 55 Cal.2d 291, 300.)

The outright removal of counsel on the ground of his alleged "incompetency," however, is even more of a threat to the independence of the bar than is arbitrary misuse of the

---

[5]Even so, we cannot exclude an attorney from participating in a particular case or field of practice; our power is limited to ordering his disbarment or suspension (Bus. & Prof. Code, § 6100), while the State Bar can do no more than issue a reproval (Bus. & Prof. Code, § 6078).

contempt power. ██ As Mr. Kanarek, writing for defendant Smith, persuasively argues, "if the advocate must labor under the threat that, at any moment, if his argument or advocacy should incur the displeasure or lack of immediate comprehension by the trial judge, he may be summarily relieved as counsel on a subjective charge of incompetency by the very trial judge he is attempting to convince, his advocacy must of necessity be most guarded and lose much of its force and effect." The inhibition imposed on a defense attorney by such a threat constitutes a serious and unwarranted impairment of his client's right to counsel. It is, in the above-quoted language of *People* v. *Crovedi* (1966) *supra*, 65 Cal.2d 199, 206, "an unreasonable interference with the individual's desire to defend himself in whatever manner he deems best. . . ."

We recognize that *Crovedi* involved a defendant who sought to be represented by retained counsel of his choice, while in the present case both Mr. Kanarek and Mr. Drake were appointed by the court because of Smith's indigency. Seizing on this distinction, county counsel invokes the general principle that an indigent defendant who requests counsel must be satisfied with the court's selection and is not entitled to demand that a different counsel be appointed. (See, e.g., *People* v. *Hughes* (1961) 57 Cal.2d 89, 98-99 [17 Cal.Rptr. 617, 367 P.2d 33], and cases cited.) But that principle—to which we adhere—is obviously inapplicable to the situation now before us: Mr. Kanarek was himself the counsel appointed by the court (Judge Brandler) to represent Smith in these proceedings, and Smith is demanding not to change that appointment but only to enforce it.

██ Nevertheless we must consider whether a court-appointed counsel may be dismissed, over the defendant's objection, in circumstances in which a retained counsel could not be removed. A superficial response is that the defendant does not pay his fee, and hence has no ground to complain as long as the attorney currently handling his case is competent. But the attorney-client relationship is not that elementary: it involves not just the casual assistance of a member of the bar, but an intimate process of consultation and planning which culminates in a state of trust and confidence between the client and his attorney. This is particularly essential, of course, when the attorney is defending the client's life or liberty. Furthermore, the relationship is independent of the source of compensation, for an attorney's responsibility is to the person

he has undertaken to represent rather than to the individual or agency which pays for the service. (See generally, California Criminal Law Practice (Cont.Ed.Bar 1964), § 1.46, pp. 38-39.) It follows that once counsel is appointed to represent an indigent defendant, whether it be the public defender or a volunteer private attorney, the parties enter into an attorney-client relationship which is no less inviolable than if counsel had been retained. To hold otherwise would be to subject that relationship to an unwarranted and invidious discrimination arising merely from the poverty of the accused.[6]

We conclude that the constitutional guarantee of the defendant's right to counsel requires that his advocate, whether retained or appointed, be free in all cases of the threat that he may be summarily relieved as "incompetent" by the very trial judge he is duty-bound to attempt to convince of the rightness of his client's cause. Here, as in *Gallagher* v. *Municipal Court* (1948) *supra*, 31 Cal.2d 784, 797, "the recognition of such an authority would involve the surrender of a substantial amount of the independence of the bar, and in many instances would deprive litigants of a fair hearing."

Accordingly, the January 23 order of Judge Alarcon purporting to remove Smith's duly appointed counsel on this ground was beyond both the statutory and inherent powers of the court. It must be vacated, and Mr. Kanarek must be reinstated as Smith's attorney of record for all further proceedings in this cause.

Let a peremptory writ of mandate issue as prayed. This order is final forthwith.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

---

[6]*People* v. *Stroble* (1951) 36 Cal.2d 615 [226 P.2d 330], relied on by county counsel, is not to the contrary. There, two deputy public defenders handled the courtroom aspects of the defense in the guilt phase of a murder trial; because of a conflict with one of the deputies, the trial judge requested the public defender himself to attend in the sanity phase. This court held (*id.* at pp. 628-629) that the procedure did not deprive the defendant of his right to counsel of his choice. The case is distinguishable on several grounds. There was no substitution of an attorney from a different office, unacquainted with the facts; the public defender "was familiar with the case, having read the daily transcript and consulted with and advised [the two trial deputies] and interviewed witnesses during the trial." (*Id.*, at p. 628.) Moreover, the deputy to whom the trial judge objected was present during the subsequent proceedings, and the defendant voiced no objection when he was advised by the public defender and represented by the other trial deputy.