[No. B035108. Second Dist., Div. One. Feb. 5, 1991.]

CENTER FOUNDATION, et al., Cross-complainants and Respondents, v.
CHICAGO INSURANCE COMPANY, Cross-defendant and Appellant.

548

**COUNSEL**

Hillsinger & Costanzo, George R. Hillsinger, Horvitz & Levy, Ellis J. Horvitz, Stephen E. Norris and M. Reed Hunter for Cross-defendant and Appellant.

Barash & Hill, Kenneth G. Katel, Alexander H. Pope and Laurence F. B. Anderews for Cross-complainants and Respondents.

**OPINION**

**VOGEL, J.**—The Center for Feeling Therapy and its therapists were sued for medical malpractice and on various intentional tort theories. A dispute arose between the Center and some of its therapists on the one hand, and their insurance carriers on the other, concerning the attorneys selected as independent counsel after the insurers reserved their rights regarding the claims for intentional torts and punitive damages. This appeal is by one of the insurers, Chicago Insurance Company, following a partially directed verdict in favor of the insureds. The record discloses substantial evidence

supporting the insurer's position and thereby demonstrates that it was error to direct a verdict. We find the error prejudicial and therefore reverse.

## FACTS

### A.

The Center was founded in 1971. It closed in 1981. Beginning in June 1981, the Center and its therapists were sued by at least 50 former patients in over a dozen lawsuits alleging a variety of intentional torts and professional malpractice. Jean Rains and the other former patients claimed they had been subjected to violence and psychological coercion to compel them to donate their services and their money to the Center and they sought more than $300 million in damages for the harm done to them. (See *Rains v. Superior Court* (1984) 150 Cal.App.3d 933, 936 [198 Cal.Rptr. 249].)

Eleven insurance companies had issued policies covering the Center and its therapists at various times relevant to the claims asserted in the *Rains* actions. All 11 carriers were notified of the claims and were requested to provide a defense. Chicago Insurance Company, Farmers Insurance Group (Truck Insurance Exchange and Fire Insurance Exchange), American Home Assurance Company, Central Mutual Insurance Company, Western World Insurance Co., Inc., Great Southwest Fire Insurance Company, Fremont Indemnity Company, Utica Mutual Insurance Company, Guaranty National Insurance Company, Glacier General Assurance Company, and the State Compensation Insurance Fund all agreed to provide a defense, each subject to a reservation of its right to contest coverage for intentional torts and punitive damages.

Inevitably, the *Rains* cases were consolidated and in 1986 they all settled.

### B.

When the 11 carriers assumed defense of the *Rains* actions, several of them retained attorneys without realizing that other carriers were involved and were also retaining attorneys for the same insureds. One group of psychotherapists (the Woldenberg group) was at the beginning represented by three experienced defense firms, Fonda & Garrard (retained by Chicago), Vletas & Greer (retained by Western World), and the Law Offices of John Kerr (retained by American Home). When the carriers discovered the overlapping representation, the attorneys were instructed to work as a team, with each firm performing particular tasks and the insurers sharing in the payment of their fees.

At this point, we digress to set the legal stage for the facts that follow. ▮ ▮ ▮ ▮ The *Rains* litigation predates the literal requirement for *Cumis* counsel (*San Diego Federal Credit Union* v. *Cumis Ins. Society, Inc.* (1984) 162 Cal.App.3d 358 [208 Cal.Rptr. 494, 50 A.L.R.4th 913]; Civ. Code, § 2860) but postdates recognition of the conflict created when an insurer provides a restricted defense based upon a reservation of rights and the concomitant requirement that, when such a conflict exists, the "insurer's obligation to defend extends to paying the reasonable value of the legal services and costs performed by independent counsel, selected by the insured" (*Executive Aviation, Inc.* v. *National Ins. Underwriters* (1971) 16 Cal.App.3d 799, 810 [94 Cal.Rptr. 347]).[1]

Because of the conflict created by the carriers' reservation of rights, many of the *Rains* defendants retained their own attorneys. The Woldenberg group selected Barash & Hill, the Center's business lawyers who had assisted in the Center's closing, liquidation and management of its assets. Although Farmers agreed to pay Barash & Hill $75 an hour to defend the Woldenberg group in the *Rains* litigation, every other carrier objected to Barash & Hill and refused to pay the firm's fees.[2]

Initially, Barash & Hill worked with the law firms retained by the carriers in an effort to implement a joint defense but disagreements arose almost immediately. Barash & Hill complained about a "defense by committee" and repeatedly attempted to assert a position as "lead counsel." There were disagreements about strategies, about the filing of additional litigation, and about whether the *Rains* cases should be "slowed down." The attorneys bickered over the editing of each other's work and Barash & Hill would not allow any other defense attorney to communicate with members of the Woldenberg group without Barash & Hill's permission and presence.

In November 1981, Barash & Hill filed a defamation action on behalf of the Woldenberg group, Hart v. McCormack, Los Angeles Superior Court case No. CA 000713, naming as defendants certain of the *Rains* plaintiffs, other former patients of the Center who had not filed medical malpractice

---

[1] Beyond this point, the facts are disputed. As required on this appeal from a judgment based upon a partially directed verdict, we therefore take as true all evidence tending to prove Chicago's case, together with all reasonable inferences to be drawn from such evidence, disregarding all evidence which does no more than raise a conflict with Chicago's evidence, and based thereon determine whether any substantial evidence tends to support Chicago's position. If there is such substantial evidence, it was error to direct a verdict. (*Estate of Fossa* (1962) 210 Cal.App.2d 464, 466 [26 Cal.Rptr. 687].)

[2] Barash & Hill considered its deal with Farmers to be an "interim" arrangement and, although the firm did not have a written fee agreement with the members of the Woldenberg group, it billed at its regular hourly rates (about $225 per hour at the time *Rains* settled), working on the assumption that it would ultimately recover the difference from someone.

actions, and members of the media. At about the same time, the Center's therapists all faced administrative license review procedures before the Board of Medical Quality Assurance (BMQA) based upon the conduct alleged by the *Rains* plaintiffs to constitute medical malpractice. Although the Woldenberg therapists were originally represented before BMQA by another law firm, Barash & Hill substituted in as their attorneys of record in those proceedings.

Barash & Hill insisted the Hart defamation action would "pressure" the *Rains* plaintiffs to settle their cases. The other defense attorneys disagreed, insisting Hart was an unwarranted expansion of the *Rains* cases. As predicted, Barash & Hill was wrong—the number of *Rains* cases increased as former patients who were sued in Hart but who had not previously sued for malpractice filed new actions against the Center and its therapists. While all this was going on, Barash & Hill continued to demand that Chicago and the other carriers contribute to the payment of its fees.

In July 1982, two members of the Woldenberg group, Jerry Binder and Werner Karle, became concerned because they did not understand what was happening in the *Rains* cases or why they were involved in the Hart defamation action. Binder and Karle discharged Barash & Hill and retained Louis Marlin. After reviewing the *Rains* files, Marlin concluded the representation provided by Barash & Hill was inadequate. Marlin tendered the defense of Binder and Karle to the carriers and Chicago agreed to pay Marlin's fees. Marlin then demanded that Chicago not retain Barash & Hill to represent the remaining members of the Woldenberg group, threatening a bad faith action if it did on the ground that such representation would create a conflict of interest with his clients.[3]

Another thing that happened in July 1982 was that Farmers, alarmed that it alone was paying Barash & Hill's mounting fees, initiated the present action by filing a complaint for declaratory relief against the other carriers to determine the insurers' respective defense responsibilities. Shortly thereafter, American Home filed a cross-complaint for declaratory relief in the Farmers action, seeking a determination whether the Woldenberg group was entitled to retain Barash & Hill as independent counsel.

In December 1982, the Woldenberg group (by Barash & Hill) filed a cross-complaint in the Farmers action against all of the carriers except Farmers, alleging causes of action for breach of contract, breach of the

---

[3] By the summer of 1982, Chicago was between the proverbial rock and hard place. The Woldenberg group threatened to sue Chicago for bad faith unless Chicago paid Barash & Hill's fees. At the same time, Binder and Karle threatened to sue Chicago for bad faith if Chicago permitted Barash & Hill to represent the Woldenberg group.

implied covenant of good faith and fair dealing, unfair practices, intentional and negligent infliction of emotional distress, conspiracy and declaratory relief, and asking for $50 million in punitive damages as well as general and special damages to be proved at trial. Farmers was later sued for bad faith when it too balked at paying Barash & Hill's fees.

Following the *Cumis* decision in December 1984 (*San Diego Federal Credit Union* v. *Cumis Ins. Society, Inc.*, *supra*, 162 Cal.App.3d 358), the Woldenberg group renewed its demand for a defense under the control of Barash & Hill. The Woldenberg group, acting through Barash & Hill, concurrently "discharged" Fonda & Garrard, the firm retained by Chicago, and demanded that Fonda & Garrard cease all work on the *Rains* cases.

Eventually, all of the carriers except Chicago agreed to contribute to Barash & Hill's fees. In early 1983, Glacier Insurance agreed to pay $25/hour in addition to the $75/hour then being paid by Farmers. Great Western paid a lump sum of $150,000. Later, Fremont split the $75/hour fee with Farmers and each then paid $37.50 per hour. The State Compensation Fund subsequently joined Farmers and Fremont and the $75/hour fee was split in thirds. Beginning in early 1985, Western World, American Home and Central Mutual together paid an additional $45 an hour.[4]

The Woldenberg group then settled its bad faith claims with all of the carriers except Chicago, and went to trial against Chicago to recover $1.7 million, the amount Barash & Hill claimed to be still due on their total bill of $3.2 million.

## C.

All of the facts set out above were established at trial. In its case-in-chief, the Woldenberg group presented evidence to establish Chicago's duty to defend and its refusal to do so (and, of course, evidence of damages and the other elements of the various causes of action pursued). In its defense, Chicago emphasized its concern that a conflict existed from the outset as to Barash & Hill because of that firm's prior dealings with the Center's business operations, its involvement in the closing of the Center, and its ongoing role as trustee of the Center's assets. Chicago also established that, as the *Rains* actions progressed, the conflicts were in its view compounded by Barash & Hill's actions taken on behalf of some but not all of therapists (including the filing of the Hart defamation action and the defense provided in the BMQA proceedings).

---

[4] Leaving to one side the $150,000 lump sum payment, Barash & Hill was thus paid an hourly rate of about $145.

Chicago also presented evidence establishing that, aside from the conflicts issue, it was not obligated to pay Barash & Hill because the firm had insufficient experience and was otherwise unqualified to defend an action as complex as the *Rains* lawsuits. The two name partners were not experienced medical malpractice litigators. Anthony Barash admitted that he "was not a litigator" and joked that as a "business lawyer he couldn't find the court-house because he hadn't been there in ten years." Jerry Hill had never tried a malpractice case. Ann Catherine Steel, the attorney assigned by Barash & Hill to have primary management responsibility for the *Rains* defense, had not only never tried a jury case but had also never taken a deposition before her involvement in the *Rains* litigation.

Louis Marlin (the attorney who took over for the Woldenberg group's two defectors, Binder and Karle) testified that Steel had "no concept of how to do trial work, no concept of how to ask questions at a deposition, no concept of the legal basis of the lawsuit she was facing." Other lawyers involved in the *Rains* litigation described Barash & Hill as "working the file for billing purposes" and as "way below the standard of competency in the field." There was evidence describing two incidents involving Barash & Hill's proposed destruction of documents; of threats by Barash & Hill against Binder and Karle, the defecting members of the Woldenberg group; and of letters from Barash & Hill to other defense attorneys "confirming" events which had not occurred.

Chicago also challenged the reasonableness of the fees charged by Barash & Hill. Barash & Hill billed for a total of 19,379.4 hours in defending the *Rains* actions, including 1,129.50 hours (for about $180,000) for a summary judgment motion described by Chicago's expert witness as a "hopeless waste of time" inasmuch as it was filed on the eve of trial and it was "inconceivable that there weren't disputes as to issues of facts." The summary judgment motion was never heard.[5]

Barash & Hill billed 263 hours for the preparation of one defendant for his deposition and an additional 85 hours for the firm's preparation for the same deposition, a total of 348 hours (8.7 weeks on a 40-billable-hour/week basis). For preparing three other defendants for their depositions, Barash &

---

[5] Assuming 40 billable hours in a week, 1,129 hours would require one attorney to spend 28 weeks (over 6 months), or 2 attorneys each to spend 14 weeks (over 3 months) on one motion. We have reviewed the motion. It includes a 179-page memorandum of points and authorities, 104 pages of declarations and a 10-page separate statement of undisputed facts. The characterization of the motion by Chicago's expert as a "hopeless waste of time" is a master-piece of understatement. Aside from the fact that the motion could be defeated by the most minimal opposition establishing the patently obvious disputed facts (Code Civ. Proc., § 437c), the motion fails to reflect the kind of editing and organization one might expect if in fact 1,129 hours had been spent in its preparation.

Hill billed 118 hours (almost 3 weeks), 131.5 hours (three weeks plus a day or so) and 140 hours (3.5 weeks). Barash & Hill then billed for the time spent preparing deposition summaries (between 40 and 87 hours for each deposition)—summaries described by Chicago's expert as useless because it would take "as long to read the summaries as the depositions themselves."

Barash & Hill's fees included billings by a single attorney for more than 24 hours in a day and for 78 hours over a four-day period. Paralegals and secretaries were sometimes billed as attorneys, at attorney rates. Time spent on noninsured cases (the Hart defamation action and the BMQA administrative proceedings) was billed to Chicago. Several witnesses described Barash & Hill's bills as "unconscionable," "unreasonable," "utterly inconceivable," "absolutely outrageous" and "way out of bounds."[6]

### D.

Over Chicago's strenuous objection, the trial court determined that the Woldenberg group had an absolute right to select its own attorneys, even if "they [couldn't] find the courthouse door," a right which could not be usurped by Chicago under any circumstances—and thus directed a verdict on the Woldenberg group's claim for breach of contract, instructing the jury that, as a matter of law, Chicago's refusal to pay Barash & Hill's fees constituted a breach of contract and that the only issue for the jury on the breach of contract claim was damages.

The jury returned a verdict awarding $1,699,999 to the Woldenberg group on the breach of contract claim, $1 less than the amount requested in final argument, and also finding that Chicago had breached its covenant of good faith and fair dealing. Although the jury specifically found that Chicago had acted with malice and oppression, it did not award punitive damages (although it did award another $200,000 for attorneys' fees incurred in prosecuting the bad faith action). The trial court added prejudgment interest in the amount of $449,340.42.

The trial court denied Chicago's motions for a new trial and for judgment notwithstanding the verdict, judgment was entered and this appeal followed. For reasons we now explain, we reverse.

---

[6] We offer a reminder that the facts have been stated in conformance with the applicable standard of review. (See fn. 1, *ante*.) If the trial court had directed a verdict in favor of Chicago, and if Barash & Hill had appealed from the judgment thereafter entered, the record would support an equally unflattering recitation of Chicago's conduct. In our view, this fact alone is sufficient to explain why it was error to direct a verdict in this case.

## Discussion

### I.

Chicago contends the trial court erred prejudicially in directing a partial verdict. We agree.

The Woldenberg group tried its case against Chicago on theories of breach of contract, breach of the implied covenant of good faith and fair dealing, unfair practices, indemnity, fraud, and declaratory relief. Following the presentation of both sides' evidence, the trial court entertained a number of motions. First, it heard and granted Chicago's motion for a directed verdict on the fraud cause of action, on the ground that there was no evidence at all of fraud. Second, it heard and granted the Woldenberg group's motion for a directed verdict on "the issue of whether or not Chicago breached its contract." Third, it heard and granted the Woldenberg group's motion that the date of breach be set at June 11, 1982, the date on which Chicago first refused "to hire counsel of choice."

Following the usual introductory instructions and others not relevant to the breach of contract issue, the trial court instructed the jury as follows:

"*[T]he court has found that Chicago breached its contract with the policyholders by refusing to pay the legal fees incurred by the policyholders.* [¶] Because the court has found that Chicago breached its contract with policyholders, the only issue before you with respect to the policyholders' claim for breach of contract is whether damages should be awarded.

"The duty of good faith and fair dealing in an insurance policy is a two-way street, running from the insured to his insurer, as well as vice versa. [¶] *The admission of any attorney to the Bar establishes that the State of California deems him competent to undertake the practice of law before all courts of the state, in any types [sic] of actions.*" (Italics added.)

The jury was instructed on the remaining issues, counsel argued, and the jury retired to deliberate and respond to a series of questions on a special verdict form. The jury returned a verdict finding that the Woldenberg group was entitled to damages caused by Chicago's breach of contract in the sum of $1,699,999.

Two issues are raised by Chicago's claim of error. First, we must determine the legal principles applicable to the breach of contract claim. Second, we must determine whether any substantial evidence tends to support

Chicago's defense to that claim. (*Estate of Fossa, supra,* 210 Cal.App.2d at p. 466.)

A.

 Relying on *Smith* v. *Superior Court* (1968) 68 Cal.2d 547 [68 Cal.Rptr. 1, 440 P.2d 65], which holds that in a criminal case a trial judge cannot, over the objection of the defendant and his attorney, remove the attorney on grounds of incompetency based upon ignorance of the law, the trial court determined that the Woldenberg group had an absolute, unqualified right to retain counsel of its choice and that Chicago had no right to require that independent counsel retained by its insureds be even minimally competent. The trial court was wrong.

For 22 years, the trial and appellate courts of this state have recognized that *Smith* should be limited to its facts—that this is so is apparent from the absence of any reported decision holding or even hinting that *Smith* applies in a case of the sort now before us. (See *Lyle* v. *Superior Court* (1981) 122 Cal.App.3d 470, 482, fn. 10 [175 Cal.Rptr. 918]; compare *Comden* v. *Superior Court* (1978) 20 Cal.3d 906, 918 [145 Cal.Rptr. 9, 576 P.2d 971, 5 A.L.R.4th 562]; *Bauguess* v. *Paine* (1978) 22 Cal.3d 626, 638 [150 Cal.Rptr. 461, 586 P.2d 942].) ██ ██ *Smith* has nothing to do with this case.[7]

 The question, then, is whether there was—at the times relevant to this dispute—any limitation on an insured's right to select independent counsel to be compensated by the insurer in conflict situations created by the insurer's reservation of rights.

 Chicago asks us to hold that section 2860 of the Civil Code, enacted in 1987 (Stats. 1987, ch. 1498, § 4, p. 5779), applies retroactively to this 1981 dispute because Chicago would then be able to claim a statutory "right to require that the counsel selected by the insured possess certain minimum qual- ifications." (Civ. Code, § 2860, subd. (c).)[8] This we cannot do. There is

---

[7] Indeed, a lawyer may be disciplined for representing a client in a field in which the attorney has no experience and without associating or consulting a sufficiently experienced attorney (*Lewis* v. *State Bar* (1981) 28 Cal.3d 683, 688-689 [170 Cal.Rptr. 634, 621 P.2d 258]) and may be sued for malpractice for venturing into an unfamiliar area without the assistance of a specialist (*Horne* v. *Peckham* (1979) 97 Cal.App.3d 404, 414-415 [158 Cal.Rptr. 714]).

[8] Section 2860 of the Civil Code codifies the *Cumis* rule by identifying the conflict which arises when an insurer reserves its rights on a given issue, by requiring the insurer to provide independent counsel to its insured under certain circumstances and by clarifying the insurer's

no indication of a legislative intent that Civil Code section 2860 operate retroactively. To the contrary, the legislative intent seems to have been just the opposite. Section 2860 of the Civil Code was part of Senate Bill No. 241, the "Willie L. Brown Jr.-Bill Lockyer Civil Liability Reform Act of 1987" (Stats. 1987, ch. 1498), a bill with six operative sections. Section 2860 was added by section 4 of Senate Bill No. 241 and section 4 was silent on the question of retroactivity. By comparison, sections 5 and 6 of the bill (which amended the punitive damages statutes, sections 3294 and 3295 of the Civil Code) expressly and unequivocally provided for application of those amendments to all actions in which trial had not commenced prior to January 1, 1988. (*Wienholz* v. *Kaiser Foundation Hospitals* (1989) 217 Cal.App.3d 1501, 1505-1506 [267 Cal.Rptr. 1].) In this instance, silence speaks loudly in favor of nonretroactivity. In any event, Civil Code section 2860 is not the sort of statute that applies retroactively. (*Evangelatos* v. *Superior Court* (1988) 44 Cal.3d 1188, 1209 [246 Cal.Rptr. 629, 753 P.2d 585].) Accordingly, we must look elsewhere for an answer.[9]

■ Similarly, *Cumis* was not with us at the time Chicago first refused to retain and pay Barash & Hill to represent the Woldenberg group. Our dispute began in 1981 and *Cumis* was not decided until December 3, 1984. (*San Diego Federal Credit Union* v. *Cumis Ins. Society, Inc.*, *supra*, 162 Cal.App.3d 358.)

Although they did not have the benefit of Civil Code section 2860 or of *Cumis*, the parties did have some guidance from the decisional law which paved the way to *Cumis*. Ten years before the Center closed and the *Rains* litigation started, the California courts recognized the conflict inherent in an insurer's reservation of rights and the need for independent counsel to protect the insured when the interests of insurer and insured diverged. On

---

role in the selection of independent counsel. Thus, subdivision (c) of Civil Code section 2860 provides that:

"When the insured has selected independent counsel to represent him or her, the insurer may exercise its right to require that the counsel selected by the insured possess certain minimum qualifications which may include that the selected counsel have (1) at least five years of civil litigation practice which includes substantial defense experience in the subject at issue in the litigation, and (2) errors and omissions coverage. The insurer's obligation to pay fees to the independent counsel selected by the insured is limited to the rates which are actually paid by the insurer to attorneys retained by it in the ordinary course of business in the defense of similar actions in the community where the claim arose or is being defended. This subdivision does not invalidate other different or additional policy provisions pertaining to attorney's fees or providing for methods of settlement of disputes concerning those fees. Any dispute concerning attorney's fees not resolved by these methods shall be resolved by final and binding arbitration by a single neutral arbitrator selected by the parties to the dispute."

[9] Chicago's reliance on *United States Fidelity & Guaranty Co.* v. *Superior Court* (1988) 204 Cal.App.3d 1513 [252 Cal.Rptr. 320] is misplaced. The fee dispute had not yet been adjudicated, and the court there was concerned only with the arbitration provision of Civil Code section 2860.

April 20, 1971, *Executive Aviation, Inc.* v. *National Ins. Underwriters* (1971) 16 Cal.App.3d 799 [94 Cal.Rptr. 347] addressed the issue head on.[10]

The insured in *Executive Aviation* claimed that under its policy's defense clause it was entitled to reimbursement for the reasonable value of the legal services rendered by its independent counsel retained because a conflict of interest existed between insurer and insured. Confronting what was then an issue of first impression in California, the court found a lack of unanimity in other jurisdictions and among scholars and found most reasonable the solution proposed by the New York Court of Appeals in *Prashker* v. *United States Guarantee Co.* (1956) 1 N.Y.2d 584 [154 N.Y.S.2d 910, 136 N.E.2d 871]: "[W]here a conflict of interest has arisen between an insurer and its insured, the attorney to defend the insured in the tort suit should be selected by the insured and the reasonable value of the professional services rendered assumed by the insurer. If the insured and the insurer are represented by two different attorneys, each of whom is pledged to promote and protect the prime interests of his client, adequate representation is guaranteed and the deleterious effect of the conflict of interest imposed on an attorney who attempts the difficult task of representing both parties is averted." (*Executive Aviation, Inc.* v. *National Ins. Underwriters, supra,* 16 Cal.App.3d at p. 809.)

*Executive Aviation* therefore held "that in a conflict of interest situation, the insurer's desire to exclusively control the defense must yield to its obligation to defend its policy holder. Accordingly, the insurer's obligation to defend extends to paying the reasonable value of the legal services and costs performed by independent counsel, selected by the insured (*Employers' Fire Insurance Company* v. *Beals* (1968) 103 R.I. 623 [240 A.2d 397])." (*Executive Aviation, Inc.* v. *National Ins. Underwriters, supra,* 16 Cal.App.3d at p. 810.)

The Rhode Island case relied upon by *Executive Aviation* is instructive on the more narrow issue before us today. In announcing the rule later adopted by *Executive Aviation,* the court in *Employers' Fire Insurance Company* v.

---

[10] Indeed, the issue had surfaced in California even earlier. In 1964, our Supreme Court set the stage for *Executive Aviation* and *Cumis* by holding that "[i]n actions in which . . . the insurer and insured have conflicting interests, the insurer may not compel the insured to surrender control of the litigation." (*Tomerlin* v. *Canadian Indemnity Co.* (1964) 61 Cal.2d 638, 648 [39 Cal.Rptr. 731, 394 P.2d 571].) As the *Cumis* court later observed, "[a]lthough *Tomerlin* did not expressly state the insurer had to pay for the insured's independent counsel under such circumstances, this is necessarily implicit in the decision. If the insurer must pay for the cost of defense and, when a conflict exists, the insured may have control of the defense if he wishes, it follows the insurer must pay for such defense conducted by independent counsel." (*San Diego Federal Credit Union* v. *Cumis Ins. Society, Inc., supra,* 162 Cal.App.3d at p. 369.)

*Beals* explained that the insurer has a "legitimate interest in seeing that any recovery [covered by the policy] is kept within reasonable bounds, and since the total expense of this defense is to be assumed by the insurer under its promise to defend, we believe that . . . *the engagement of an independent counsel to represent the insured should be approved by the insurer. Such approval, however, should not be unreasonably withheld.*" (*Employers' Fire Insurance Company* v. *Beals* (1968) 103 R.I. 623 [240 A.2d 397, 404]; italics added.)

California law, as it existed during the life of this case, mandated the same conclusion. (See also *Previews, Inc.* v. *California Union Ins. Co.* (9th Cir. 1981) 640 F.2d 1026.) ■ It was (and still is) the law that the covenants of good faith and fair dealing implied by law to exist in every insurance contract are binding upon both parties, the insured as well as the insurer. (*Liberty Mut. Ins. Co.* v. *Altfillisch Constr. Co.* (1977) 70 Cal.App.3d 789, 797 [139 Cal.Rptr. 91]; *California Casualty Gen. Ins. Co.* v. *Superior Court* (1985) 173 Cal.App.3d 274, 283-284 [218 Cal.Rptr. 817].) ■ In our view, the duty of good faith imposed upon an insured includes the obligation to act reasonably in selecting as independent counsel an experienced attorney qualified to present a meaningful defense and willing to engage in ethical billing practices susceptible to review at a standard stricter than that of the marketplace. Conduct arguably acceptable in the ordinary attorney-client relationship where the latter pays the former from his own pocket[11] is not necessarily appropriate in the tripartite context created when independent counsel undertakes to represent the insured at the expense of the insurer. This is not a new concept. (See, e.g., *Meinhard* v. *Salmon* (1928) 249 N.Y. 458 [164 N.E. 545, 546].)

Accordingly, while no California case decided prior to 1982 had expressly held that an insurer had a right to reject independent counsel selected by its insured, it certainly cannot be said that, as a matter of law, Chicago breached its obligations to the Woldenberg group by asserting a right to approve the attorneys retained by its insureds, provided that such approval was not unreasonably withheld.[12]

---

[11] We are not suggesting that incompetent or unethical conduct is ever appropriate but simply acknowledging that there may be situations where a client chooses to pay more than a reasonable person might conclude is appropriate under the circumstances.

[12] Barash & Hill relies on *California Shoppers, Inc.* v. *Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 15 [221 Cal.Rptr. 171], for the proposition that Chicago's reasonableness could not be a defense to the breach of contract cause of action; that Chicago had to establish "justification" for its conduct (which Barash & Hill says is something more than "reasonableness"); and that Chicago waived the right to do so by failing to plead justification as an affirmative defense. This is pure sophistry. As we have shown, Chicago's *contractual* obligation to its insured was to accept the insured's selection of counsel unless it had a *reasonable* basis for refusing to do so. The question for the jury was whether Chicago's approval was

## B.

It follows necessarily that the question whether Chicago breached its contractual duty to its insureds required a factual finding whether it unreasonably refused to approve the Woldenberg group's selection of Barash & Hill. The evidence supporting Chicago's defense to the Woldenberg group's claim of breach of contract, examined as required on review of a directed verdict (see pp. 551-554, *ante*) is sufficiently substantial to compel the conclusion that it was error to direct the jury that, as a matter of law, Chicago had breached its contract. (Code Civ. Proc., § 630; *Estate of Fossa, supra*, 210 Cal.App.2d at p. 466; *Hilliard* v. *A.H. Robins Co.* (1983) 148 Cal.App.3d 374, 395 [196 Cal.Rptr. 117] [in considering a motion for a directed verdict, the trial court may not weigh or consider conflicting evidence or judge the credibility of witnesses].)

Moreover, if the jury had found a breach, it was for the jury and not the court to determine when the breach occurred. Although the trial court determined the breach occurred when Chicago first refused to retain Barash & Hill, June 11, 1982, we do not perceive this answer to be required as a matter of law. Depending upon the jury's perception of the evidence, it might have been reasonable for Chicago to refuse to retain Barash & Hill at the outset but not at a later date. The date is painfully relevant to the issue of damages—if the breach occurred months or years into the *Rains* litigation, the fees recoverable by the Woldenberg group would be only those incurred after the date of breach. It follows ineluctably that the error in directing a verdict on the issues of breach and the date thereof was prejudicial and requires reversal.[13]

---

unreasonably withheld (which would constitute a breach of its contractual duty to defend) and we refuse to engage in the linguistic gymnastics necessary to decide whether, on these facts, there is any practical difference between "reasonable" and "justifiable." *California Shoppers* is inapposite.

[13] The Woldenberg group asserts that even if it was error to direct a verdict on the issue of breach, the error was not prejudicial because the jury's findings that Chicago acted with "malice, fraud or oppression" necessarily means that even without the trial court's direction the jury would have found against Chicago. We disagree. Although the jury did find that Chicago acted with "malice, fraud or oppression," it did not award any punitive damages and it is impossible to determine whether the same finding would have been made without the partial directed verdict. Our review of the instructions in the sequence given discloses fertile ground for confusion and we have no doubt in this case that the error was prejudicial.

Moreover, by instructing the jury that Chicago breached its contractual obligations "by failing to pay the fees incurred by the policyholders," the trial court implicitly told the jury that the full $1.7 million in fees charged by Barash & Hill was recoverable and took from the jury the question whether those fees were reasonable. The jury's award of $1 less than the $1.7 million requested leaves little room for doubt that this is how the instruction was understood.

## DISPOSITION

For the reasons explained above, the judgment is reversed and the matter is remanded for retrial. Each party is to bear its own costs on appeal.[14]

Devich, Acting P. J., and Ortega, J., concurred.

---

[14] Because we reverse on the grounds stated, we do not reach Chicago's additional claims of error.