Filed 5/28/14  P. v. Sarkissyan CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.111.5.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>HOVANES SARKISSYAN,<br><br>    Defendant and Appellant. | 2d Crim. No. B248373<br>(Super. Ct. No. 2011018935)<br>(Ventura County) |

Hovanes Sarkissyan appeals his conviction by jury of two counts of attempted premeditated murder (Pen. Code, §§ 664/187, subd. (a))[1] with special findings that he personally inflicted great bodily injury on Andrew Martin.  (§ 12022.7, subd. (a).) The trial court sentenced appellant to 53 years to life state prison.  Appellant claims, among other things, that the trial court abused its discretion in not granting a new trial based on ineffective assistance of trial counsel.  We modify the judgment to reflect that a mandatory $80 court security fee (§ 1465.8, subd. (a)(1)) and a $60 criminal conviction assessment (Gov. Code, § 70373) were imposed. The judgment, as modified, is affirmed.

*Facts & Procedural History*

On the evening of May 19, 2011, appellant talked to his ex-girlfriend, Charlotte Sinclair, at Camino Real Park in Ventura.  Charlotte's friends approached and

---

[1] All statutory references are to the Penal Code unless otherwise stated.

chastised appellant about his violent relationship with Charlotte. Angry, appellant left the park and returned with two men who stabbed Charlotte's friends, Alexander Myers and Andrew Martin. During the attack, appellant dropped his car keys and cell phone. Appellant returned minutes later to retrieve the keys and phone and spoke to Jacob Blackwell, Charlotte's cousin.

Earlier that evening, Charlotte, Blackwell, Alexander Myers, Andrew Martin, Kaitlinn Farris, Cheyenne Laws, and Janessa Trujillo consumed alcohol, marijuana and prescription medication in the park. Charlotte saw appellant walking a dog and called out his nickname, "Johnny."

Myers and Blackwell were concerned about Charlotte's safety because appellant had physically harmed Charlotte in the past. Myers sent Martin a phone text message at 7:55 p.m. saying: "We're meeting up with Johnny, keep watch." Myers approached and called appellant a woman beater. Angry words were exchanged and appellant left the park in a silver four-door vehicle.

The group stayed in the park. Using Myers' phone, Charlotte texted appellant several times. At 8:40 p.m. Charlotte spoke to appellant on the phone. Charlotte told everyone to leave because appellant was coming back with some guys to fight. Charlotte changed shoes in case she had to run or fight. Fearing for Charlotte's safety, Blackwell called Charlotte's sister, Katherine Sinclair, to pick Charlotte up.

A few minutes later, three men dressed in dark pants and hoodies rushed the group and stabbed Myers and Martin multiple times. Blackwell saw appellant and a second man on top of Martin. As one of the men brandished a knife at Blackwell, appellant yelled, "Let's go, let's go, let's go."

Katherine Sinclair arrived moments later and saw appellant and two men standing by a silver car in the parking lot. Katherine took Myers, who was critically wounded, to the hospital.

Blackwell picked up his friends' belongings and found appellant's cell phone. At 9:00 p.m., Blackwell used the phone to call Charlotte who had Blackwell's phone. Returning to the park, Charlotte exchanged Blackwell's phone for appellant's

2

phone. A minute or two later, appellant approached Blackwell and picked up his car keys. Appellant asked where his cell phone was. Blackwell said that Charlotte had it.

Andrew Martin stumbled home and was transported to the hospital. Martin told the police that a man with glasses whose name started with "J" exchanged words with Myers. Martin said that J returned with two men and attacked the group.

Blackwell identified appellant in a photo lineup and said that appellant was wearing glasses, a zipped up hoodie, and black plants. He described the two other men as Hispanic "gang-banger" types who wore hooded sweatshirts and dark pants.

Charlotte's sister, Katherine, told the police that appellant was in the parking lot. Katherine identified a picture of appellant on Facebook and feared that appellant would harm her for talking to the police.

Appellant lived a quarter mile from the park, about a 10 minute walk. The police arrested him on May 25, 2011 at home. A silver four-door Honda was parked in front of his house.

At trial, Blackwell identified appellant as one of the assailants. Myers recalled exchanging words with appellant but had no memory of the stabbing. Katherine was reluctant to testify and minimized her prior statements.

Appellant defended on the theory that it was a case of misidentification. Although no witnesses testified for the defense, the jury was instructed that appellant did not have to prove he was elsewhere when the crimes were committed. (CALCRIM 3400.)[2]

Before sentencing, appellant retained new counsel and moved for new trial on the ground that he was denied effective assistance of counsel at trial. Appellant

_____

[2] The jury received a CALCRIM 3400 alibi instruction that stated: "The People must prove that the defendant committed the crimes charged in this case. The defendant contends he did not commit these crimes. The People must prove that the defendant was present and committed the crimes with which he is charged. The defendant does not need to prove he was elsewhere at the time of the crime. [¶] If you have a reasonable doubt about whether the defendant was present when the crime was committed, you must find him not guilty."

3

claimed that his trial attorney, Wolfgang Kovach, failed to call appellant's mother and her boyfriend as alibi witnesses. The trial court conducted a multi-day evidentiary hearing and denied the motion, finding that Kovach made a reasonable strategic decision not to call family members as alibi witnesses. In an eight-page order, the trial court found that appellant had not shown deficient performance or resulting prejudice.

## *Ineffective Assistance of Counsel*

To prevail on a claim of ineffective assistance of counsel, appellant must show both deficient performance and resulting prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693]; *People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.) "A defendant must prove prejudice that is a " ' "demonstrable reality," not simply speculation.' [Citations.]" (*Ibid*.) Because the trial judge is the best situated to determine the competency of defendant's trial counsel, the trial court's decision is entitled to great weight. (*People v. Wallin* (1981) 124 Cal.App.3d 479, 483.) "Absent a showing of clear and unmistakable abuse, we will not disturb his [or her] decision. [Citations]" (*Ibid*.)

## *Alibi Witnesses*

Appellant argues that Kovach was constitutionally ineffective in not calling his mother, Anahid Aivazyan, his sister (Gayane Sarkissyan), and the mother's boyfriend (Nieves Perez) as alibi witnesses. At the hearing on the new trial motion, Aivazyan said that she got home from work at 8:34 p.m., made dinner, and that appellant was playing video games in his bedroom. Aivazyan claimed that appellant was at home the entire evening.

Aivazyan's boyfriend, Perez, said that he got home at 6:00 p.m. and either saw or heard appellant in the house. Perez claimed that appellant walked the dog at 6:30 p.m., returned 10 minutes later, and stayed home the rest of the evening. On cross-examination, Perez acknowledged that he was not in the same room with appellant and did not have appellant under constant observation.

Gayane Sarkissyan, appellant's sister, declared that she told Kovach that Aivazyan and Perez could testify that appellant was home the evening of May 19, 2011.

4

The sister lived in Azusa and heard about the stabbing six days later when appellant was arrested. Kovach told the sister that Aivazyan was too emotional and the prosecution would "eat her alive" if she testified.

For tactical reasons, Kovach decided not to call Aivazyan as a trial witness because she lacked credibility and could be easily impeached. Aivazyan gave inconsistent statements to Ventura Police Detective Sarah Starr and was a poor witness at the preliminary hearing. After the hearing, Kovach told Aivazyan that she was too emotional and would be a poor trial witness.

Kovach's concerns were well founded. In a taped interview, Aivazyan told Detective Starr that she returned home in the afternoon rather than 8:35 p.m. Aivazyan was vague about appellant's whereabouts and said "I see him in the house all the time" and "[h]e was in the house, yeah. " Aivazyan told Detective Starr that appellant did not go out that evening.

Aivazyan's statement conflicted with the boyfriend's (Nieves Perez) statement that appellant took the dog for a ten minute walk. Perez denied that appellant was driving the silver Honda but that was refuted by appellant's sister, appellant's mother, and Charlotte. When Katherine Sinclair arrived at the park to pickup Charlotte, appellant and two men were standing by a silver car.

Kovach reasonably believed that Aivasyan's and Perez's testimony would undermine the mistaken identity defense. Perez's and Aivazyan's testimony was at odds with the phone records and eyewitness testimony that appellant encountered the victims earlier in the park, left in a rage, phoned Charlotte at 8:40 p.m., and returned with two men and attacked the victims. The timeline was short: Myers was admitted to the hospital at 9:03 p.m..

Kovach, as a matter of trial tactics, reasonably believed that Aivasyan's and Perez's testimony would bolster the People's case and show that appellant had the opportunity to commit the crimes. Appellant lived a quarter a mile from the park, was seen in the park, and had a motive to stab the victims. In the words of the trial court, "this was not a close case and there is not a reasonable probability that the result of the

5

proceeding would have been different had the . . . [alibi] testimony been presented at the original trial."

We agree. Appellant was seen in the park before, during, and after the stabbing. The phone records, lost cell phone, and lost car keys were damning evidence. Appellant returned to the park to retrieve his keys, spoke to Blackwell, and left word for Charlotte to return his phone. Without the car keys, appellant could not drive home. That was corroborated by Katherine Sinclair who saw appellant and two men standing by the silver car.

In *In re Alcox* (2006) 137 Cal.App.4th 657, 665-666, we held that the tactical decision not to develop an alibi defense is not ineffective assistance of counsel where counsel reasonably fears the alibi witness would open the door to further incriminating evidence. The same analysis applies here. Attorney Kovach reasonably believed the testimony of biased family members would cause more harm than good.

Appellant's reliance on *Luna v. Cambra* (9th Cir. 2002) 306 F.3d 954 is misplaced. There, defendant testified that he was asleep when a robbery and stabbing were committed. Defense counsel failed to contact defendant's mother and sister who would have corroborated defendant. (*Id.*, at p. 961.) Counsel also failed to interview and subpoena a man who confessed to the robbery (*Id.*, at p. 962.) On review, the federal court concluded that the testimony of three alibi witnesses would have significantly altered the evidentiary posture of the case. (*Id.*, at p. 966.) "It is hard to conceive how a criminal defendant is not prejudiced when his attorney wholly fails to investigate evidence that he was not at the scene of the crime and that another man was guilty of the crime for which he was charged." (*Id.*, at p. 967.)

Unlike *Luna v. Cambra, supra,* there is no defense witness who could say that appellant was not at the park. Appellant's ineffective assistance of counsel claim is based on hindsight and speculation. Kovach reasonably believed that calling Aivazyan as a defense witness would undermine the misidentification defense and alibi instruction that "defendant does not have to prove he was elsewhere at time of the crime." (CALCRIM 3400.) Kovach met with Aivazyan a dozen times and discussed how her

testimony would hurt appellant's case. At the hearing on the motion for new trial, Kovach stated that "from all the . . . interviews that I read and heard, they all . . . saw Mr. Hovanes there in the park walking his dog. There was really no dispute of that."

In reviewing ineffective assistance of counsel claims, appellate courts do not generally second-guess counsel's tactical decisions. (*People v. Hinton* (2006) 37 Cal.4th 839, 876; *People v. Holt* (1997) 15 Cal.4th 619, 703.) Where the issue is raised in a motion for new trial, we defer to the trial court's finding that appellant received adequate representation. (*People v. Andrade* (2000) 79 Cal.App.4th 651, 660.) " 'After all, the trial court is in the best position to make an initial determination, and intelligently evaluate whether counsel's acts or omissions were those of a reasonably competent attorney.' [Citation.]" (*Ibid.*) Here the trial court found: "Defendant's home was within 10 minutes from the park . . . and the evidence was uncontroverted that the Defendant was at the park prior to the crimes. . . . [¶] Having presided over the trial and the evidentiary hearing on the motion for new trial, the court is not persuaded that the Defendant was prejudiced by trial court's performance."

Appellant complains that it was Kovach's first felony trial and that he was too inexperienced to try an attempted murder case.[3] Lack of trial experience does not in and of itself establish incompetence. (See e.g., *Smith v. Superior Court* (1968) 68 Cal.2d 547, 552-553, fn. 1.) While other counsel might have objected to some of the evidence and the prosecutor's comments, not doing so is not equatable with constitutional error. Minor deficiencies in counsel's performance did not affect the verdict.

### *Uncharged Domestic Violence*

Appellant argues that the trial court erred in receiving evidence of uncharged acts of domestic violence. (Evid. Code, § 1101, subd. (b).) Before trial, the prosecution advised the trial court that the evidence would show that the victims

---

[3] Kovach testified that that he has practiced law since 2000 and that 90 percent of his practice is devoted to criminal defense work. Kovach handled at least six jury trials and negotiated pleas in hundreds of cases before appellant's trial.

chastised appellant about his violent relationship with Charlotte. The People's theory was that the uncharged domestic violence evidence would show that appellant was angered by the remarks and the motive for the stabbings was revenge. The trial court responded, "Since it is being framed as an [Evidence Code section] 1101 [issue], . . . I'll need to make a ruling on it and hear Mr. Kovach out on it." Appellant did not request a hearing or object to the evidence, waiving the alleged error. (Evid. Code, § 353; *People v. Partida* (2005) 37 Cal.4th 428, 433-434.)

Appellant claims that the prosecutor engaged in misconduct during opening statement when she referred to appellant's and Charlotte's violent relationship and stated that the evidence would show that Myers approached appellant and Charlotte because he was concerned there was going to be trouble. Appellant did not object, forfeiting the alleged error. (*People v. Schmeck* (2005) 37 Cal.4th 240, 286; *People v. Seaton* (2001) 26 Cal.4th 599, 682.) On the merits, there was no prosecutorial misconduct or prejudice. During the opening statement, a prosecutor may make fair comments on what the evidence will show as long as those comments are not deceptive, unfair, or reprehensible. (*People v. Farnam* (2002) 28 Cal.4th 107, 168.) Appellant's related claim of ineffective assistance of counsel and derivative federal constitutional claims fail as a matter of law. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 84; *People v. Boyette* (2002) 29 Cal.4th 381, 424.)

Responding to the prosecution's opening statement, defense counsel told the jury that the evidence would show that Blackwell and Myers made "taunting remarks at [appellant], calling him a wife beater, calling him a woman beater with no basis whatsoever. [¶] . . . The facts will show that Charlotte Sinclair became very upset, not only at Jacob Blackwell and Alexander Myers for coming over there and interfering with her business [but for] making [appellant] leave . . . ." Kovach told the jury that appellant left the park and three "gang-bangers" wearing hooded sweatshirts and dark pants attacked the group.

Appellant asserts that the uncharged domestic violence evidence was prejudicial but forfeited the claim. (Evid. Code, § 353; *People v. Partida* (2005) 37

8

Cal.4th 428, 433-434.) Prior bad acts evidence is not admissible to prove criminal disposition but may be received to prove motive, intent, plan, knowledge, identity, or the absence of mistake or accident. (Evid. Code, § 1101, subd, (b); *People v. Ewoldt* (1994) 7 Cal.4th 380, 393-394 & fn. 1.) As long as there is a direct relationship between the prior bad act and an element of the charged offense, introduction of that evidence is proper. (See *People v. Barnett* (1998) 17 Cal.4th 1044, 1118 [motive]. Appellant's prior act of domestic violence was probative of motive and explained what sparked the deadly assault. (*Ibid*.; *People v. Fuiava* (2012) 53 Cal.4th 622, 666.) "[E]vidence of motive makes the crime understandable and renders the inferences regarding defendant's intent more reasonable." (*People v. Roldan* (2005) 35 Cal.4th 646, 707.) The trial court did not abuse its discretion in concluding that the probative value of the domestic violence evidence substantially outweighed the potential for prejudice. (Evid. Code § 352; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369.) Appellant makes no showing that the ruling, express or implied, was arbitrary, whimsical, or capricious as a matter of law. (*People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1614.)

Appellant asserts that he was denied a fair trial but federal due process rights are not implicated where the prior bad acts evidence is relevant and admissible to show intent, motive, or why a witness is reluctant to testify. (*People v. Catlin* (2001) 26 Cal.4th 81, 122-123; *People v. Martinez* (2003) 113 Cal.App.4th 400, 414.) It is settled that the application of ordinary rules of evidence under state law does not violate a federal constitutional right to present a defense or right to a fair trial. (*People v. Dement* (2011) 53 Cal.4th 1, 52; *People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.)

*Prosecutorial Misconduct - Final Argument*

Appellant asserts, for the first time on appeal, that the prosecutor engaged in prejudicial misconduct in arguing that "motive in this case is big, ladies and gentlemen. Don't mistake it. It is very big. . . . It is why this defendant does this because of his anger, because of the way that he deals with things, his violence, because he wants to send a message on to these kids not to mess with him, that he's serious, that he's going

9

to take action.  And he wants revenge against Alex [Myers] for confronting him in the park. "

Appellant did not object, forfeiting the alleged error.  The test for misconduct is whether the prosecutor employed deceptive or reprehensible methods to persuade the jury.  (*People v. Dennis* (1998) 17 Cal.4th 468, 522.)  Prosecutors have wide latitude to discuss and draw inferences from the trial evidence.  (*Ibid*.)  We do not look to isolated words or phases, but view the statements in the context of the argument as a whole. (*Ibid*.)  Here there is no reasonable likelihood that the comments misled the jury or rendered the trial fundamentally unfair.  (*People v. Morales* (2001) 25 Cal.4th 34, 47; *People v. Samayoa* (1997) 15 Cal.4th 795, 841; *People v. Booker* (2011) 51 Cal.4th 141, 186.)  The jury was instructed that nothing the attorneys say is evidence (CALCRIM 222),  and that the domestic violence evidence was to be considered for the limited purpose of determining motive.  (CALCRIM 375.)   The trial court instructed: "Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime."   It is presumed that the jury understood and followed the instructions. (*People v. Morales, supra,* 25 Cal.4th at p. 47.)

Assuming that evidentiary or prosecutorial error occurred, it was harmless beyond a reasonable doubt.  (*People v. Hardy* (1992) 2 Cal.4th 86, 173; *People v. Harris* (1989) 47 Cal.3d 1047, 1083.)  The testimony about appellant's and Charlotte's violent relationship was weak and refuted by Charlotte at trial.  Although the uncharged domestic violence evidence tended to show motive for the retaliatory attack, the focal point of the case was the assailants' identity.  The defense theory was that the prosecution witnesses were biased and too intoxicated to make a credible identification.  Testimony about uncharged acts of domestic violence and the prosecutor's references to that evidence did not deny appellant a fair trial.  The evidence was overwhelming.  The eyewitness testimony and phone records show that appellant encountered Charlotte and the victims at 8:00 p.m.  Appellant argued with Myers and left the park.  Charlotte and appellant texted one another at 8:21 and 8:24 p.m.  At 8:40 p.m. appellant called and said that he was coming back with some guys to fight.  Appellant and two men arrived a few minutes later

10

and stabbed the victims.  As appellant ran to the silver car, he dropped his car keys and phone.  At 9:00 and 9:02 p.m., calls were made from appellant's phone to Blackwell's phone.  The calls corroborated Blackwell's testimony that appellant returned to the park to retrieve his keys and the phone shortly after the stabbing.

*Ineffective Assistance of Counsel*

Appellant argues that trial counsel was constitutionally ineffective in not objecting to the prosecutor's closing remarks that appellant "deals with things" in a violent manner.  Failure to object rarely constitutes constitutionally ineffective legal representation.  (*People v. Boyette* (2002) 29 Cal.4th 381, 424.)  Kovach may have believed that an objection would draw the jury's attention to motive and the jury instruction that intent and/or mental state may be proved by circumstantial evidence.  (CALCRIM 225; see e.g., *People v. Hinton*  (2006) 37 Cal.4th 839, 878; *People v. Catlin* (2001) 26 Cal.4th 81, 165.)  Where trial counsel is confronted with difficult and nuanced tactical decisions, we do not second guess counsel's decision not to object to an isolated remark. (*People v. Montoya* (2007) 149 Cal.App.4th 1139. 1147-1148.)

Kovach reasonably believed, as a matter of trial tactics, that the most credible defense was misidentification.  Kovach argued that three unidentified "gang-bangers" stabbed the victims  and that Andrew Martin only saw the assailant's glasses.  Kovach argued that the prosecution witnesses were too intoxicated to identify appellant and told the jury that the domestic violence evidence had nothing to do with the case.  Charlotte testified that appellant "never committed any violence against her. . . ."  When appellant returned to fetch his phone and car keys, he was calm  and there was no blood on his clothes or shoes.  Kovach argued that Blackwell's description of appellant's clothes (dark pants and a zipped-up hoodie) conflicted with Katherine Sinclair's statement that appellant was wearing jeans and a flannel shirt.  It struck a cord with the jury.  During jury deliberations, the jury requested a read back of Blackwell's and Myer's testimony.

Appellant dwells on "what-ifs" and speculative defense scenarios but courts are not in the business of "second-guessing" defense counsel's tactical decisions.  (*In re Alcox, supra,* 137 Cal.App.4th at p. 665.)  Kovach did not have a constitutional duty to

11

make groundless objections or call biased witnesses that would undermine appellant's only viable defense. (*People v. Osband* (1996) 13 Cal.4h 622, 678; *People v. Mendoza* (2000) 78 Cal.App.4th 918, 924.) "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produce a just result." (*Strickland v. Washington*, *supra,* 466 U.S. at p. 686 [80 L.Ed.2d at pp. 692-693].)

Having reviewed the entire record, we cannot say that appellant was denied competent and effective representation. None of the alleged errors cited by appellant, either singularly or cumulatively, were prejudicial or denied appellant a fair trial. "A defendant is entitled to a fair trial, not a perfect one. [Citation.]" (*People v. Mincey* (1992) 2 Cal.4th 408, 454.)

*Sentencing Errors*

Appellant asserts, and the Attorney General agrees, that the abstract of judgment erroneously lists April 19, 2013, as the date of conviction. April 19, 2013, is the date sentence was pronounced. The superior court clerk is directed to amend the abstract of judgment to reflect that appellant was convicted on August 30, 2011, the date the guilty verdict was entered. (See *People v. Davis* (2010) 185 Cal.App.4th 998, 1001.) We modify the judgment to reflect that a mandatory $80 court security fee (§ 1465.8, subd. (a)(1)) and $60 criminal conviction assessment (Gov. Code, § 70373) were imposed. (See *People v. Woods* (2010) 191 Cal.App.4th 269, 272 [imposition of court security fee and court facility assessment are mandatory]; *People v. Rodriguez* (2012) 207 Cal.App.4th 1540, 1543, fn. 3 [mandatory security fees and assessments may be imposed on appeal].)

Appellant complains that the April 19, 2013 minute order states "You are to pay Prob Investigation fee of $1,754" even though the fee was not imposed at the sentencing hearing. (§ 1203.1b.) Where there is a discrepancy between the oral pronouncement of judgment and the minute order, the oral pronouncement of judgment controls. (*People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2.) Section 1203.1b required

12

that the trial court determine appellant's ability to pay and the payment amount. (*Brown v. Superior Court* (2002) 101 Cal.App.4th 313, 321.) Without a finding of appellant's ability to pay, imposition of a probation investigation fee is unauthorized. (*People v. Hall* (2002) 103 Cal.App.4th 889, 894.)

*Conclusion*

The clerk of the superior court is directed to: (1) strike the $1,754 probation investigation fee from the April 19, 2013 minute order; (2) amend the April 19, 2013 minute order and abstract of judgment to reflect the imposition of a $80 court security fee (§ 1465.8, subd. (a)(1) and a $60 criminal conviction assessment (Gov. Code, § 70373); (3) amend the abstract of judgment to reflect an August 30, 2011 conviction date; and (4) forward a certified copy of the amended abstract of judgment to the California Department of Corrections and Rehabilitation.

The judgment, as modified, is affirmed.

NOT TO BE PUBLISHED.

YEGAN, J.

We concur:


GILBERT, P.J.


PERREN, J.

13

Kevin G. DeNoce, Judge

Superior Court County of Ventura

_____

Sylvia Whatley Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven E. Mercer, Marc A. Kohn, Deputy Attorneys General, for Plaintiff and Respondent.